492 F.2d 735
 Royall COLLINS
v.
Joseph R. BRIERLY, Superintendent State Correctional
Institution atPittsburgh, Pennsylvania, Appellant.
Royall COLLINS, Appellant,
v.
Joseph R. BRIERLY, Superintendent State Correctional
Institution atPittsburgh, Pennsylvania.
 Nos. 72-1036 and 72-1037.
 United States Court of Appeals, Third Circuit.
 Argued Jan. 9, 1973, Submitted on Rehearing en banc Nov. 16, 1973.
Decided Feb. 5, 1974, As Amended March 12, 1974.
 
 James D. McDonald, Jr., Quinn, Plate, Gent, Buseck & Leemhuis, Erie, Pa., for Royall Collins.
 R. Gordon Kennedy, Dist. Atty., Frank L. Kroto, Jr., Asst. Dist. Atty., Erie County, Pa., for the Commonwealth.
 Argued Jan. 9, 1973.
 Before McLAUGHLIN and VAN DUSEN, Circuit Judges, and GREEN, District Judge.
 Submitted en banc Nov. 16, 1973.
 Before SEITZ, Chief Judge, and McLAUGHLIN, VAN DUSEN, ALDISERT, ADAMS, GIBBONS, ROSENN, HUNTER, WEIS and GARTH, Circuit Judges.
 OPINION OF THE COURT
 WEIS, Circuit Judge.
 
 
 1
 During the course of an armed robbery in Erie, Pennsylvania on April 27, 1967, one Nicholas Fytikas was shot and killed by Norman Stanyard, an acquaintance of petitioner, Royall Collins, alleged to be the driver of the getaway car. After a jury trial in the Court of Common Pleas of Erie County, Pennsylvania, Collins was convicted of second degree murder, and the judgment was affirmed by the Pennsylvania Supreme Court.[1] During the course of its opinion, that Court held that it had been error to admit a statement of Collins into evidence at his trial but that the ruling of the trial judge had been harmless in view of other evidence in the case.
 
 
 2
 On a petition for writ of habeas corpus, the United States District Court for the Western District of Pennsylvania found that the 'error' had not been harmless, although it accepted the view of the Pennsylvania appellante court that the statement had been secured in violation of petitioner's constitutional rights.[2] On this latter point we differ with both the Pennsylvania Supreme Court and the District Court, and we reverse.
 
 
 3
 The record establishes that Collins and two friends, Carr and Seawright, went to the home of a friend at about 10:00 P.M. on April 26, 1967, where they met Stanyard. Later that evening all four left in petitioner's automobile. Where they went thereafter is disputed. Collins contended that they took Stanyard to Eighteenth and Parade Streets in Erie, Pennsylvania and did not see him again that day. The contested statement that the petitioner made to police contained little more than this information.
 
 
 4
 Stanyard, however, testified that all four first drove to Sixteenth and Parade Streets where he robbed a Spur Gas Station at a gunpoint while the others remained in the car. After driving around for about an hour, it was decided by all to rob an establishment called 'Steve's Lunch' located at Sixteenth and State Streets, about four blocks from the gas station. Again Stanyard went into the lunch room alone while the others waited outside. When the proprietor attempted to dive below a counter top, he was shot by Stanyard. The others drove away and Stanyard fled on foot. The shooting occurred about 2:00 A.M., and Stanyard was apprehended a few hours later.[3]
 
 
 5
 About 5:00 P.M. on that same day, Detective Kalinowski of the Erie Police force went to petitioner's residence and found both Collins and Seawright there. They were asked and agreed to accompany the police to headquarters. When they arrived there, Kalinowski told Collins, Seawright, and three other youths that they were going to have a lineup and that the police wanted to see if 'this boy can identify some of them . . .' The detective testified that '. . . I think it was Seawright, he already knew who the boy was because I guess he saw it on T.V. or something.'[4]
 
 
 6
 After the lineup, Seawright and Collins were taken to separate rooms, and each was interviewed privately. Kalinowski testified at the suppression hearing that he gave petitioner a card on which his 'rights' were printed and asked Collins to read it and, if he understood it, to sign it. Collins replied that he did understand it and at the officer's request signed the form.[5]
 
 
 7
 Following this, according to the version at the suppression hearing, Kalinowski told Collins that they wished to talk to him about the 'Nicholas Fytikas case and about Stanyard.' At the trial several months later, the detective testified that 'before signing that (the waiver form), we told him that we were going to ask him question regarding the shooting done by Norman Stanyard and then we explained his rights to him . . .'
 
 
 8
 Collins testified at the suppression hearing that the time he was questioned he had not known that Fytikas had been killed or that Stanyard was involved.[6]
 
 
 9
 Petitioner did not testify at the evidentiary hearing in the district court.
 
 
 10
 The Court of Common Pleas, in rejecting a motion for a new trial, wrote:
 
 
 11
 'Counsel also argues that (the statement) is inadmissible because the officers did not advise Collins of the reasons for his detention on questioning until after he was advised of his rights, and until after he signed the waiver. It is our opinion that the sequence is unimportant as long as Collins knew his rights when the questioning began. That this is so is, in our opinion, an established fact.'
 
 
 12
 The court then discussed the requirements set out in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and concluded, 'We believe that Collins was properly apprised of these matters and that he effectively waived his privilege and that he did so knowingly and intelligently.'6A
 
 
 13
 We understand these statements to be a finding that the officers had in fact advised the petitioner of the reasons for his interrogation. A plurality of the Supreme Court of Pennsylvania[7] seemingly made a similar interpretation because its opinion assumed that there was error based on the time when the notice was given, not that it was actually lacking. We acknowledge that the state appellate court's phraseology is not as precise on this point as might be desired. The court stated:
 
 
 14
 'We agree with appellant that an intelligent and understanding waiver of the right to counsel is impossible where the defendant has not been informed of the crime which is being investigated.' 259 A.2d 160, 163 (1969).
 
 But the opinion went on to say at 163-164:
 
 15
 'The court below was of the view that so long as appellant knew why he was being held when the questioning began, that is enough. We cannot agree. The crucial moment is the time when the waiver is signed. Once an accused has signed the waiver stating that he is willing to give a statement, it is no longer efficacious that he then be told what he is being questioned about. The compulsive force of the unintelligent waiver has already had its effect. We thus hold that it was error to admit appellant's statement.'
 
 
 16
 We have serious reservations about on interpretation of Miranda v. Arizona, supra, which would require that before custodial interrogation begins, in addition the mandated declarations, a statement must be made by the police as to the nature of the crime under investigation. That landmark decision was painstakingly specific in listing the basic constitutional rights which the police must propound to a suspect before he is questioned. Nowhere is there the slightest indication that there must be included a warning about the nature of the crime which has led to the interrogation conference, what the penalty is for the offense, what the elements of the offense consist of, and similar matters. That these might be requisites for the entry of a valid guilty plea in open court is not relevant to the standards applicable to the custodial interrogation stage of a prosecution. In a sense, all of these elements might conceivably enter into an 'intelligent and understanding' rejection of an offer for the assistance of counsel, but the simple answer is that Miranda does not by its terms go so far. It requires that the accused be advised of his rights so that he may make a rational decision, not necessarily the best one or one that would be reached only after long and painstaking deliberation. Indeed, it may be argued forcefully that a choice by a defendant to forego the presence of counsel at a police interrogation is almost invariably an unintelligent course of action.[8] It is not in the sense of shrewdness that Miranda speaks of 'intelligent' waiver but rather in the tenor that the individual must know of his available options before deciding what he thinks best suits his particular situation. In this context intelligence is not equated with wisdom. See United States v. Hall, 396 F.2d 841 (4th Cir. 1968), cert. denied, 393 U.S. 918, 89 S.Ct. 248, 21 L.Ed.2d 205 (1968).
 
 
 17
 It is possible that in some situations the fact that the suspect was not aware of the offense under investigation would be of concern to the court in evaluating the totality of the circumstances to determine the voluntariness of a statement.[9] This is quite different, however, from a holding that unless the information is included in the pre-interrogation litany, a confession is per se inadmissible.
 
 
 18
 We need not and do not decide this question, however, since our inquiry may be limited to the issue of whether the 'waiver' was ineffective because it was signed before the petitioner was advised of the nature of the crime with which the interrogation was concerned. This was the reason assigned by the Pennsylvania appellate court, as we read its plurality opinion, for finding that there had been error of constitutional dimension in the trial court's ruling. We say again that whether the disclosure was made before or after the 'waiver' is a matter of substantial dispute, and any inference to the contrary which might be gathered from the opinion of the state Supreme Court is not justified by a review of the record in the trial court.[10] But assuming, arguendo, only that Collins was not told about the reason he was to be questioned until after he had signed the document in police headquarters, we conclude nevertheless that the statement was admissible.
 
 
 19
 The 'waiver' which is referred to in the majority opinion in Miranda is explained in the dissent of Justice Harlan as being some type of affirmative statement of rejection of rights. As the Court points out, however, a suspect has the privilege at any time of refusing to answer questions or to continue without the presence of counsel, and hence, the 'waiver' has no enforceable effect whatsoever. It may be assumed that its main purpose is evidentiary, to establish with a minimum of difficulty and a maximum of certainty that the police gave the warnings and that the suspect had agreed-- preliminarily-- to answer questions. Most police organizations now require that a writing by used. To be precise, however, a 'waiver' in its usual sense does not occur until a witness actually answers a question. Only when he takes such an affirmative action does the waiver occur. Anything preceding that step is but a freely revocable statement of intent.
 
 
 20
 The signing of the 'waiver' therefore had no legally compulsive effect; there is no contention or evidence that the police represented it as such, nor anything in the record to establish that it was so understood by petitioner. The mere act of signing, therefore, was not crucial in the context in which it is urged in this case.
 
 
 21
 We conclude that there was adequate evidence in this case to meet the Commonwealth's burden of establishing the voluntariness of the confession by a preponderance of the evidence, Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972), and that therefore the ruling of the state trial judge was not constitutionally erroneous.
 
 
 22
 One other point raised by the parties on appeal requires some discussion. Collins contends that his state court conviction was also constitutionally flawed because the pretrial identification process in this case was so suggestive that the identification at trial was in violation of due process. Because the lineup identification in this case took place before United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), the test of the validity of the identification is whether the confrontation was 'so unnecessarily suggestive and conducive to irreparable mistaken identification that he (the defendant) was denied due process of law.' Stovall v. Denno, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967). We agree with the district court's determination that Stanyard's in-court identification had an independent source and could have been based on Stanyard's prior opportunity to observe Collins during the hours Collins admittedly spent with Stanyard on the evening preceding the murder. While it is true that Stanyard did not, in fact, immediately identify Collins, this may be only for the reason that Stanyard did not wish to identify him, rather than an inability to identify him. Moreover, we believe that the identification procedure was not so impermissibly suggestive as to deny Collins due process of law under the principle enunciated in Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969). The other cases relied on by Collins on this point are inapposite.
 
 
 23
 The order of the district court will be reversed.
 
 
 24
 ADAMS, Circuit Judge (dissenting).
 
 
 25
 I agree with much of the language and reasoning employed by the majority. In my view, however, this case does not call for an outright reversal of the district court's judgment, but rather for a remand to determine whether Collins' waiver of rights was voluntarily, knowingly and intelligently undertaken. Thus I respectfully dissent from the result the majority reaches.
 
 
 26
 The uncontroverted facts of the case show that Collins, in police custody, was given the Miranda warnings, that he then signed a form headed 'waiver' that recited that he understood his rights and was willing to make a statement, and that he proceeded to make some inculpatory remarks.
 
 
 27
 There is a blaring conflict in the evidence concerning whether Collins knew of the reasons for his interrogation, either at the time the waiver form was signed or when the subsequent questioning actually began.[1] This conflict remains unresolved at this stage.
 
 
 28
 The Supreme Court of Pennsylvania, believing that Collins was unaware of the reasons for his interrogation when he executed the waiver form, held that a waiver obtained from such an uninformed suspect constituted a per se violation of the rule of Miranda, and rendered the admission of his subsequent inculpatory remarks erroneous.[2] However it sustained the conviction, because it found this to be harmless error.
 
 
 29
 On the petition for habeas, the district court agreed that there was a per se violation of the Miranda rule, but, contrary to the Pennsylvania Supreme Court, thought that admission at trial of the remarks was prejudicial-- not harmless-- error. Accordingly, it granted Collins' petition.
 
 
 30
 Though conceding that the evidence as to when Collins was advised of the reason for the interrogation is conflicting, the majority seizes upon a statement of the state trial court that 'Collins knew his rights when the questioning began,' and turns this into a 'finding' that 'the officers had in fact advised the petitioner of the reasons for his interrogation' at the time questioning began.[3]
 
 
 31
 The majority rejects the district court's conclusion that failure to apprise a suspect of the reason for his interrogation before the signing of a Miranda waiver automatically vitiates the admissibility of any statements the suspect may thereafter utter. But instead of remanding to the district court for findings as to the voluntariness of the waiver, the majority reverses the grant of habeas corpus, and holds that the statement itself was 'voluntary.' This holding is apparently bottomed on the majority's conclusion that Collins was advised of the reasons for his interrogation prior to answering any questions. The fact that the majority labels this a 'finding,' of course, does not make it so.
 
 
 32
 I agree that neither Miranda nor anything else in our law requires the automatic exclusion of statements uttered after a waiver form has been signed by a suspect who was, at the moment of signing, unaware of the reasons for his interrogation. The Miranda warnings themselves are prophylactic; the slightest lacuna in the required recitation of rights renders any subsequent statement inadmissible. Informing a suspect of the reason for his detention and interrogation is concededly not a required element of the Miranda warnings.
 
 
 33
 The standards for judging the effectiveness of a waiver by the suspect of his rights, however, are not so mechanical as the standards dealing with the giving of the warnings. The critical question must be whether in fact, after recitation of the Miranda warnings, the suspect knowingly, intelligently and voluntarily waived the rights to counsel and to remain silent.[4] Anything less is ineffective as a waiver.[5] Thus, for example, though in a particular case the reciation of the Miranda rights might be in all respects adequate, a subsequent waiver executed by a mentally incompetent, or semi-comatose, or intoxicated person would likely be ineffective and the admission of statements made after such a waiver would violate his constitutional rights.[6]
 
 
 34
 In Miranda itself the Supreme Court stated that:
 
 
 35
 'If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.'[7]
 
 
 36
 Moreover, the Supreme Court has stated that 'courts indulge every reasonable presumption against (finding voluntary) waiver,'[8] since 'we do not presume acquiescence in the loss of fundamental rights.'[9]
 
 
 37
 A waiver of the rights enumerated in the Miranda warnings-- the right to remain silent and the right to counsel-- occurred in this case. Collins was advised of those rights, then made 'an express statement that (he was) willing to make a statement . . ..'[10] Then, 'the interrogation continue(d) without the presence of an attorney and a statement (was) taken . . ..'[11] In these circumstances, the well-reticulated contours of the Miranda rule require that the state be put to its proof to show that the waiver-- and not the inculpatory statement alone-- was voluntary, knowing and intelligent.[12]
 
 
 38
 The question of the effectiveness of a waiver of rights can be answered only by a 'careful sifting of the unique facts and circumstances of each case.'[13] No one fact is, normally, conclusive. Rather:
 
 
 39
 'The determination . . . must depend . . . upon the particular facts and circumstances surrounding (the) case, including the background, experience and conduct of the accused.'[14]
 
 
 40
 An appropriate factor to be considered, though by no means a talismanic one, is whether the suspect knew of the incident that gave rise to his detention and interrogation. This fact remains disputed in this case; contrary to what the majority asserts, it is patently unclear from the record whether Collins was told, either before signing the waiver form or before answering his interlocutors' questions, that he was being interrogated in connection with the slaying of Fytikas.
 
 
 41
 Further complicating this case is the fact that the Miranda forms read to Collins did not indicate that he had the right at any time during the proceeding to remain silent and to insist on the presence of counsel, even after signing the waiver form or even after having answered one or more questions. Though, as the majority concludes, the waiver form had no 'legally compulsive effect,' it may have had a psychologically compelling effect upon Collins. It may be that a suspect who signs a Miranda waiver form, without being told that he can stop at any time, and then learns for the first time what the subject of the questioning is, may not understand that he then has the option of remaining silent.
 
 
 42
 In light of these considerations, the factual question whether Collins was aware that his constitutional entitlement to silence and counsel continued throughout his interrogation might be important to a determination of the informed and intelligent nature of his waiver. Yet this fact issue remains undetermined at this juncture.[15]
 
 
 43
 In the absence of a finding by a trial court on the crucial issues of this case, it is inappropriate for this Court to attempt to ascertain whether, in fact, Collins' waiver was voluntarily made. Necessarily, then, we may not proceed to determine the subsequent issue of the voluntariness of the statement itself, for if the waiver were involuntary in fact, Miranda would preclude our consideration of that question.[16] The district court, not this Court, is the proper forum for a determination, first, whether and when Collins knew of the reasons for the interrogation, and second, whether, given all the facts, his waiver of rights was effective.
 
 
 44
 Should the district court find that Collins' waiver of rights was involuntary and unintelligent, it would be compelled to rule, as would we, that the inculpatory statement was improperly obtained. Ordinarily, there would then remain for determination the question whether the introduction of such statement at trial was harmless error. However, the district court has concluded that the use of Collins' statement was prejudicial, since, though Collins himself testified to the same effect on the witness stand, the state did not show that his replicative trial testimony was not 'in fact impelled by the prosecution's wrongful use of (Collins') illegally obtained confessions.'[17] When a suspect takes the stand and gives testimony that duplicates an illegally obtained statement that has been introduced against him, the burden falls upon the state to show the absence of a causal connection between the illegal evidence and the trial testimony.[18]
 
 
 45
 The state's failure of prood on the issue of harmless error is, under Harrison v. United States, supra, fatal to any contention that introduction of Collins' statement, if improper, was harmless. Thus, were the district court, upon remand, to find that Collins' waiver was ineffective, it would appear bound to issue the writ.
 
 
 46
 The decision in Miranda has engenered a litany of controversy and criticism, including legislative[19] and judicial[20] efforts to buffer Miranda's impact upon the prosecutorial process. Even with these efforts, however, the central doctrine of that case is still law. Though I, too, would have 'serious reservations' about any undue expansion of the Miranda rule, the Supreme Court's edict that waiver by a suspect of his Fifth and Sixth Amendment rights must be found to be knowing, voluntary and intelligent is still a vital and vigorous proposition.[21]
 
 
 47
 It is particularly important that a tribunal constituted and equipped to make factual findings be entrusted with the task of gauging the effectiveness of a suspect's waiver of rights. The Supreme Court has observed that 'the requirement of a knowing and intelligent waiver has been applied only to those rights which the Constitution guarantees to a criminal defendant in order to preserve a fair trial.'[22] The right of counsel and the privilege against self-incrimination are, beyond question, among the essential ingredients of a fair proceeding. There is a risk that the constitutional guarantees are weakened where an appellate court, such as this, lifts from a district court the initial responsibility for ascertaining the facts surrounding such a waiver. Yet the result the majority reaches-- an outright reversal and denial of habeas corpus, predicated upon a 'finding' that was not made in the courts below-- does nothing less.
 
 
 48
 Accordingly, I would reverse and remand as stated in the first paragraph of this opinion. Judges McLaughlin and Van Dusen have authorized me to state that they join in this dissenting opinion.
 
 
 
 [1]
 Commonwealth v. Collins, 436 Pa. 114, 259 A.2d 160 (1969)
 
 
 [2]
 Collins v. Brierly, 336 F.Supp. 1024 (W.D.Pa.1971)
 
 
 [3]
 Stanyard pleaded guilty to murder generally before Collins' case was called to trial
 
 
 [4]
 Transcript of suppression hearing at 22. Following an on-the-record colloquy, the following question was then put to the detective by defense counsel:
 'Question: So then you do recall then telling Collins that he was being taken to the County Jail to be in a lineup to see if Stanyard could identify him, is that correct?
 'Answer: That is correct.'
 
 
 [5]
 'BUREAU OF CRIMINAL INVESTIGATION
 Erie Police Department Erie, Pennsylvania
 YOUR RIGHTS
 DATE April 27, 1967 TIME 6:12 P.M.
 BEFORE WE ASK YOU ANY QUESTIONS, YOU MUST UNDERSTAND YOUR RIGHTS. YOU HAVE THE RIGHT TO REMAIN SILENT. ANYTHING YOU SAY CAN BE USED AGAINST YOU IN COURT. YOU HAVE THE RIGHT TO TALK TO A LAWYER FOR ADVICE BEFORE WE ASK YOU ANY QUESTIONS, AND TO HAVE HIM WITH YOU DURING THE QUESTIONING. YOU HAVE THIS RIGHT TO THE ADVICE AND PRESENCE OF A LAWYER AND IF YOU CANNOT AFFORD TO HIRE ONE, ONE WILL BE APPOINTED FOR YOU.
 WAIVER
 I HAVE READ THE STATEMENT OF MY RIGHTS SHOWN ABOVE. I UNDERSTAND WHAT MY RIGHTS ARE. I AM WILLING TO ANSWER QUESTIONS AND MAKE A STATEMENT.
 (SIGNED) ROYALL COLLINS
 WITNESS DET. SGT. CARL
 KALINOWSKI
 WITNESS DET. SGT. JOSEPH
 MOSOKOWSKI'
 The police officer said that a addition to receiving the standard warnings, the defendant was told that 'he has the right to use the telephone any time he wants to.' (Transcript of Suppression Hearing, p. 4)
 We note that this 'waiver' does not contain the admonition which is seen in some forms advising that the questioning may be stopped at any time and that the request for an attorney may be made at any time during the interrogation. While this addition would be desirable, its absence did not constitute a violation of the Miranda warning procedures.
 
 
 [6]
 The transcript of the suppression hearing also contains the following exchange between petitioner and his counsel:
 'Q. And did you understand what they read to you at that time, Royall?
 'A. Well, I would have to say in the way it was set up to be because I thought to be that particular time the part where it says we don't, cannot get an attorney, we can get the Court to appoint you one, so I figured what did I need with an attorney, so I figured I would have to pay for an attorney, I didn't have the understanding that the Court would pay for the attorney. That is the part I really didn't understand about but I said I did understand.
 'Q. Was there any reason why you thought you didn't need an attorney?
 'A. Because I hadn't did anything, I thought why should I have an attorney.
 'Q. You didn't know--
 'A. -- what reason, I hadn't did nothing, I didn't know what they were holding me for so why should I have an attorney.' at 9-10.
 Later under cross-examination, Collins admitted that he was a high school graduate, that he understood what he had read, and that he did understand that he had the right to an attorney. At the time these events occurred, petitioner was 23 years of age, and there was no evidence that he had any physical or mental disabilities.
 After the suppression hearings, the state trial judge found specifically that Collins understood the warnings given by the police, that the oral statement was given voluntarily by the defendant and after he had intelligently waived his rights.
 6A As to the effect of such a finding, see LaVallee v. Delle Rose, 410 U.S. 690, 93 S.Ct. 1203, 35 L.Ed.2d 637 (1973).
 
 
 [7]
 Three judges of the Collins court joined in the opinion; four concurred without expression of views. Although the Pennsylvania Supreme Court questioned the precedential value of the Collins case on the issue in point here in Commonwealth v. Cooper, 444 Pa. 122, 278 A.2d 895 (1971), that opinion was subsequently withdrawn, and a revised opinion which omitted the commentary on the need to specifically inform an accused of the exact crime was substituted at 297 A.2d 108 (1971). See the later cases of Commonwealth v. Boykin, 450 Pa. 25, 298 A.2d 258 (1972), and Commonwealth v. McIntyre, 451 Pa. 42, 301 A.2d 832 (1973)
 
 
 [8]
 See Kuh, Interrogation of Criminal Defendants-- Some Views on Miranda v. Arizona, 35 Fordham L.Rev. 169, 234 (1966)
 
 
 [9]
 See Waiver of Miranda Rights, 36 U.Chi.L.Rev. 413, 432 (1969)
 In federal prosecutions, 18 U.S.C. 3501(b) provides that in determining the issue of voluntariness of a confession, the trial judge shall take into consideration among other factors '. . . whether such defendant knew the nature of the offense . . .' However, the presence or absence of any of the factors listed in the statute need not be conclusive on the issue.
 
 
 [10]
 The trial court made no specific finding of fact on whether petitioner was informed by the police before or after signing the 'waiver' or if he knew from other sources that Fytikas had been shot and that Stanyard was involved. There was however sufficient evidence from which the Court of Common Pleas could have concluded that Collins knew the reason for the investigation before he signed the form
 
 
 [1]
 At trial. Detective Kalinowski, one of Collins' interlocutors, testified that 'before interlocutors, testified that 'ebeofe signing (the waiver form), we told him that we were going to ask him questions regarding the shooting done by Norman Stanyard and then we explained his rights to him . . ..' Earlier, however, at the suppression hearings, Kalinowski's testimony indicated that Collins had not been told the reasons for his interrogation until after the signing of the waiver form. On the other hand, Collins testified that at the time he was questioned he had not known that Fytikas had been killed or that Stanyard was involved
 The state trial court concluded, at a second suppression hearing, that the Miranda waiver was intelligently entered. In so concluding, however, it did not address itself to the question whether Collins, at the time of his waiver, was aware of the Fytikas killing or of Stanyard's implication in it. At a third suppression hearing the state trial court again failed to make a finding that Collins was so aware. Absent some indication on the record that the state trial court actually considered Collins' contention that he was uninformed of the reasons for his interrogation, the state court's conclusion that the waiver was intelligently made does not meet the 'strict standard' established by Miranda, Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), and Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).
 Nor can the statement of the state court, made in rejecting Collins' motion for a new trial, that he was 'properly apprised of these matters (his Miranda rights) and that he effectively waived his privilege . . .,' be construed as a finding that Collins was aware of the killing at the time he signed the waiver. (See page 737 fn. 6 and p. 738 of majority opinion.) The record in this case thus leaves us with no assurance that the 'correct standards' for determining the effectiveness of a waiver have been applied. Cf. LaVallee v. Delle Rose, 410 U.S. 690, 695, 3 S.Ct. 1203, 1206, 35 L.Ed.2d 637 (1973); 28 U.S.C. 2254(d), where the Supreme Court noted that the state trial judge expressly found that the confessions 'were, in all respects, voluntary, and legally admissible in evidence at trial,' and the Supreme Court held that the state trial court had applied the correct voluntariness standards.
 
 
 [2]
 A plurality of the Pennsylvania Supreme Court stated that 'an intelligent and understanding waiver of the right to counsel is impossible where the defendant has not been informed of the crime which is being investigated.' Commonwealth v. Collins, 436 Pa. 114, 259 A.2d 160, 163 (1969). See the majority opinion at p. 738, n. 7
 
 
 [3]
 It appears that Collins had been read and shown a form, set forth at Note 5 of the majority opinion, enumerating his Fifth and Sixth Amendment rights, before questioning began. That this is so says nothing concerning whether Collins knew the 'reasons for his interrogation,' i.e., that he was being questioned in connection with the slaying of Fytikas
 
 
 [4]
 Miranda v. Arizona, 384 U.S. 436, 475, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Escobedo v. Illinois, 378 U.S. 478, 490, n. 14, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). Accord, Schneckloth v. Bustamonte, 412 U.S. 218, 238-246, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)
 
 
 [5]
 Carnley v. Cochran, 369 U.S. 506, 516, 82 S.Ct. 884, 8 L.Ed.2d 70 (1962)
 
 
 [6]
 See, e.g., United States v. Dutkiewicz, 431 F.2d 969 (3d Cir. 1970) (per curiam)
 
 
 [7]
 384 U.S. at 475, 86 S.Ct. at 1628
 
 
 [8]
 Aetna Ins. Co. v. Kennedy, 301 U.S. 389, 393, 57 S.Ct. 809, 812, 81 L.Ed. 1177 (1937)
 
 
 [9]
 Ohio Bell Tel. Co. v. Public Utilities Comm'n, 301 U.S. 292, 307, 57 S.Ct. 724, 731, 81 L.Ed. 1093 (1937). The presumption against voluntary waiver, and the strict standard of proof imposed on the state, have not been diluted or tempered by Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972), which requires that the state prove the voluntariness of a confession at a suppression hearing by a preponderance of the evidence. See Schneckloth v. Bustamonte, supra, 412 U.S. at 241, 93 S.Ct. 2041
 
 
 [10]
 384 U.S. at 475, 86 S.Ct. at 1628
 
 
 [11]
 See text accompanying Note 6, supra
 
 
 [12]
 Collins testified as follows at a suppression hearing:
 Q. Was there any reason why you thought you didn't need an attorney?
 COLLINS: What reason, I hadn't did nothing, I didn't know what they were holding me for, so why should I have an attorney.
 There is no claim that Collins did not understand the warnings, simpliciter.
 
 
 [13]
 Schneckloth v. Bustamonte, supra, 412 U.S. at 233, 93 S.Ct. at 2050
 
 
 [14]
 Johnson v. Zerbst, supra, 304 U.S. at 464, 58 S.Ct. at 1023
 
 
 [15]
 The right to insist on silence or counsel even after having once waived them is apparently not a requisite element of the Miranda warnings, but it is a right nonetheless. See 384 U.S. at 455, 86 S.Ct. 1602. Many law enforcement agencies, in giving the Miranda warnings, do inform the suspect that his rights continue even after a waiver. See, e.g., GSA Federal Rpotective Service Division, 'Warning as to Your Rights,' which informs a suspect that, 'If you want to answer questions now without a lawyer present you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk toa lawyer.'
 
 
 [16]
 See 384 U.S. at 444, 86 S.Ct. 1602
 
 
 [17]
 District court opinion, Knox, J
 
 
 [18]
 See Harrison v. United States, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968)
 
 
 [19]
 See the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. 3501(a), (b). The Senate Report on the Act termed Miranda a 'most disastrous blow to the cause of law enforcement in this country.' A Senate Committee 'found that there is a need for legislation to offset the harmful effects of (Miranda and Escobedo, supra).' 1968 U.S.Code Cong. and Admin.News, pp. 2112, 2127
 
 
 [20]
 See, e.g., Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971)
 
 
 [21]
 The 'knowing and intelligent' standard was recently discussed and reaffirmed by the Supreme Court, in Schneckloth v. Bustamonte, supra
 
 
 [22]
 Schneckloth v. Bustamonte, supra, 412 U.S. at 237, 93 S.Ct. at 2052