COMMONWEALTH vs. GILBERT A. MEDEIROS.

Bristol.  May 6, 1985. — July 9, 1985.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, & O'CONNOR, JJ.

*Homicide.  Practice, Criminal,* Instructions to jury, Voluntariness of state-
ment.  *Constitutional Law,* Admissions and confessions, Waiver of con-
stitutional rights.  *Evidence,* Admissions and confessions, Photograph.
*Waiver.*

Where, at the trial of a defendant accused of killing the victim by ligature
strangulation, no view of the evidence would have warranted a verdict
of guilty of involuntary manslaughter, the defendant could not have been
prejudiced by any deficiencies in the judge's instructions to the jury
respecting this offense. [340-342]

At a murder trial, the judge's instruction to the jury on voluntary manslaugh-
ter, to which no objection was taken, created no substantial likelihood
of a miscarriage of justice. [342]

Police officers who, after informing an individual that they were investi-
gating the theft of a telephone paging device, advised him of his Miranda
rights were not constitutionally required to readvise him of his Miranda
rights before beginning to question him about the murder of the person
in whose apartment the device had been found. [342-345]

Evidence presented at hearings on a criminal defendant's motion to suppress
certain admissions he made to police amply supported the judge's implied
findings that the defendant understood the Miranda warnings which had
been given him, that he knowingly and intelligently waived his rights
thereunder and elected to make the statements in question to the police,
and that the statements were made by him freely and voluntarily.
[345-348]

Neither the fact that a criminal defendant had submitted to a polygraph ex-
amination in the course of his interrogation by police, nor the fact that
he was told of the examiner's conclusion that he had answered certain
questions deceptively, demonstrated that his subsequent inculpatory
statements to the police were coerced. [348-349]

Although it was error for the judge at a murder trial to inform the jury, during
his charge, that the Commonwealth does not have the death penalty,
his statement did not, in the circumstances, require reversal of the defend-
ant's conviction of murder in the second degree. [349-351]

The judge at a murder trial did not abuse his discretion in admitting in evidence a photograph of the victim's body, depicting the position and depth of the injuries to the neck, taken at an autopsy conducted approximately one month after his death. [351-352]

Alleged factual inconsistencies in the testimony given at a murder trial, particularly regarding the cause of the victim's death, created no substantial likelihood of a miscarriage of justice. [352-353]

In a criminal trial conducted prior to this court's decision in *Commonwealth v. Tavares,* 385 Mass. 140, 152 (1982), there was no error in the judge's instructions to the jury respecting the Commonwealth's burden of proving the voluntariness of the defendant's admissions. [353]

INDICTMENT found and returned in the Superior Court Department on February 22, 1980.

The case was tried before *James P. McGuire,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Raymond A. Letourneau (John P. Letourneau* with him) for the defendant.

*Phillip L. Weiner,* Assistant District Attorney (*Dana A. Curhan,* Assistant District Attorney, with him) for the Commonwealth.

HENNESSEY, C.J. The defendant, Gilbert A. Medeiros, is appealing his conviction by a jury in the Superior Court for the murder in the second degree of William N. Lawrence. He contends that the trial judge erred in: (1) failing to instruct the jury properly on the lesser included offense of involuntary manslaughter; (2) denying the defendant's motion to suppress statements made to the police; (3) informing the jury, during his charge, that the Commonwealth does not have a death penalty; and (4) admitting in evidence a photograph of the victim taken at an autopsy conducted approximately one month after his death. He also claims that certain errors, although not objected to at trial, pose a substantial risk of a miscarriage of justice and therefore warrant a new trial.

The facts may be summarized as follows. William Lawrence was found dead in his New Bedford apartment on December 28, 1979. He was lying on a bed with a pillow over his face and a rope loosely hanging around his neck. There was dried

blood on the victim's face and the pillow was also bloodstained. The victim suffered from epilepsy and indulged in alcohol and drug abuse. Several pill bottles, some of which were empty, were found at the foot of the bed along with a telephone paging beeper. After medical examiner Dr. Stanley Koczera examined the victim's body, it was removed to a funeral home. The next day, Dr. Koczera and Dr. Ambrose Keeley, the State pathologist, arrived at the funeral home to conduct an autopsy but were refused permission to do so. The victim's death certificate, signed by Dr. Koczera, attributed the cause of death to "[a]sphyxiation due to obstruction of airway" resulting from suicide. The victim's body was buried without an autopsy having been performed.

The police discovered that the beeper found in the victim's apartment had been stolen from a New Bedford resident on December 18, 1979, the day on which she had a new rug installed in her home. The defendant was identified as one of the men who had installed the rug. At about noon on January 15, 1980, two police detectives went to a game room to speak with the defendant. After becoming visibly upset, the defendant agreed to talk to them in their cruiser, where they informed him that they were investigating the theft of the beeper. He agreed to accompany the detectives to the police station, after being told that he was not under arrest. He arrived at the station at about 1 P.M., at which time he was taken to an interrogation room and advised of his Miranda rights. In response to police questioning, the defendant admitted installing the rug, but denied taking the beeper. He was then asked whether he knew Lawrence and admitted that he did. One of the detectives then explained his "theory" of the beeper to the defendant, accusing him of taking the beeper to Lawrence's apartment, fighting with the victim, and consequently causing his death. The defendant was not readvised of his Miranda rights at this time. After further questioning, the defendant admitted stealing the beeper and meeting Lawrence on December 22, 1979, but denied fighting with the victim or even visiting his apartment. At about 2 P.M. the defendant agreed to take a polygraph test. Prior to the test, the examiner read him his Miranda rights and

the defendant signed a consent form attesting to the voluntariness of the examination. After the polygraph examination, at approximately 4:15 P.M., the defendant was again advised of his Miranda rights and again indicated that he understood and intended to waive his rights. However, he refused to sign a waiver of rights form. He was then told that the results of the polygraph examination showed he had answered certain questions deceptively.[1] As a result of further questioning, the defendant admitted going to Lawrence's apartment on December 23, 1979. He stated that while at the apartment, Lawrence made a homosexual advance toward him which he warded off by striking the victim. Lawrence then allegedly hit the defendant as he was attempting to leave the apartment and the defendant struck him back, causing the victim to fall onto the bed. The defendant then climbed atop the victim and struck him on the head twice more. At that point Lawrence appeared to be unconscious, his face was bloody, and he was foaming at the mouth. The defendant alleged that he then put a pillow over the victim's face and loosely looped the end of a rope, which was in the room and used as a fire escape device, around the victim's neck. At about 5:45 P.M. the defendant was asked and agreed to sign a waiver of rights form. His statement was then read to additional police officers, and the defendant interjected periodically to clarify, correct, or add details. The defendant was then placed under arrest for Lawrence's murder. His pretrial motion to suppress all the foregoing statements was denied.

As a result of the defendant's admissions, the victim's body was exhumed on January 23, 1980, and an autopsy was conducted by Dr. Keeley. The autopsy report stated that Lawrence "died of blunt force injuries of the head and asphyxia secondary to ligature strangulation." At trial, Dr. Keeley admitted that none of the most common alterations normally appearing in a person who died from ligature strangulation was found. He

---

[1] Specifically, the following questions, which were answered in the negative, were brought to the defendant's attention: (1) whether he had gone to Lawrence's apartment? (2) whether he got into a fight with Lawrence? (3) whether he lost the beeper in Lawrence's car? (4) whether he killed Lawrence?

explained their absence as due to advanced decomposition. A pathologist who testified for the defense stated that, after reviewing the autopsy report and facts presented, he could not determine, with reasonable medical certainty, the date or cause of the victim's death. The defendant did not testify at trial. On December 15, 1980, the jury returned verdicts against the defendant of larceny and murder in the second degree. The defendant's motion for a new trial was denied, and we transferred the case to this court on our own motion.

1. *Manslaughter Instructions.*

The defendant claims that the judge erred in failing to instruct the jury properly on involuntary manslaughter. In response to the defendant's request, such an instruction was given. However, after the charge,[2] the defendant's request for curative instructions was denied. The Commonwealth argues that involuntary manslaughter instructions were not warranted by the evidence and therefore any deficiencies in the instruction could not prejudice the defendant. We agree.

"Involuntary manslaughter is an unlawful homicide, unintentionally caused (1) in the commission of an unlawful act, malum in se, not amounting to a felony nor likely to endanger life, . . . or (2) by an act which constitutes such a disregard of prob-

---

[2] The judge instructed the jury in relevant part: "An unlawful killing which falls short of murder because malice is not proved is manslaughter. The two types of manslaughter open for your consideration upon the evidence are involuntary manslaughter and voluntary manslaughter.

"To constitute reckless conduct as distinguished from negligence, grave danger to another person must have been apparent, and the defendant must have chosen to run the risk rather than alter his conduct as to avoid the acts which caused harm. The basics must be wanton and reckless misconduct, which is different in kind and in the material degree from negligence or gross negligence.

"Manslaughter may also be present if one kills another in the heat of blood, in sudden combat or upon reasonable provocation. This is called voluntary manslaughter. Reasonable provocation is the kind of provocation that would inflame a reasonable and law abiding man to the point where he would be capable of killing another. Words alone, no matter how abusive or humiliating, cannot provide a reasonable provocation.

"Well, we speak of the heat of blood and sudden combat or upon reasonable provocation. You may consider all the evidence that occurred and is presented to you as to what happened in the room of Lawrence on this night."

able harmful consequences to another as to constitute wanton or reckless conduct." *Commonwealth* v. *Campbell,* 352 Mass. 387, 397 (1967), and cases cited. It is well established that, "if any view of the evidence in a case would permit a finding of manslaughter rather than murder, a manslaughter charge should be given. . . . On the other hand, a judge need not charge on a hypothesis not supported by evidence." *Commonwealth* v. *Walden,* 380 Mass. 724, 726-727 (1980).

The Commonwealth argues that where death is caused by ligature strangulation, "[o]n no view of the evidence could the jury rationally have found that the death . . . was caused unintentionally." *Id.* at 730. See *Commonwealth* v. *Santo,* 375 Mass. 299, 306 (1978). The defendant contends that the jury could have disregarded Dr. Keeley's opinion as to the cause of Lawrence's death and inferred from other medical testimony that he died as the result of the defendant's blows, either alone or as the catalyst of an epileptic seizure. According to the defendant, "that scenario . . . would be involuntary manslaughter at worst." We disagree. Even assuming that the defendant's "hypothesis . . . is entirely true," *Campbell, supra* at 398, the evidence would warrant an instruction on voluntary, not involuntary, manslaughter. According to the statements the defendant gave the police, he struck Lawrence to ward off his sexual advances. He alleged that the victim made verbal overtures to him and tried to pull the defendant towards him. In response, the defendant struck the victim. Then, as the defendant attempted to leave the apartment, Lawrence allegedly struck him in the face. At this point, the defendant knocked Lawrence onto the bed, climbed on top of him and hit him twice more about the head until he was unconscious.

"Voluntary manslaughter is a killing from a sudden transport of passion or heat of blood upon a reasonable provocation and without malice or upon sudden combat." *Commonwealth* v. *Peters,* 372 Mass. 319, 324 (1977), quoting *Commonwealth* v. *Soaris,* 275 Mass. 291, 299 (1931). Voluntary manslaughter also encompasses deaths caused by the use of excessive force in self-defense. *Commonwealth* v. *Walden,* 380 Mass. 724, 729 (1980). *Commonwealth* v. *Kendrick,* 351 Mass. 203,

211-212 (1966). To resolve all inferences in the defendant's favor, *Campbell, supra* at 398, we will assume that the victim's advances constituted reasonable provocation and that there was some continuing threat to the defendant's well being. The same inferences, however, are insufficient to warrant an involuntary manslaughter instruction. By his own admissions, the defendant deliberately and repeatedly struck the victim, even while the victim was subdued and lying on his back. "The unlawful battery was quite 'likely to endanger life,' and hence could not be classified [as] . . . involuntary manslaughter. Plainly the result of the [blows], i.e., physical injury to the deceased, was intended as much as the [blows themselves]. Hence, it cannot be termed merely a 'disregard of probable harmful consequences.'" *Commonwealth* v. *Hicks,* 356 Mass. 442, 445 (1969). Having concluded that the defendant was not entitled to an involuntary manslaughter instruction, any deficiencies in the judge's charge on this issue cannot be considered prejudicial. Cf. *Commonwealth* v. *Puleio,* 394 Mass. 101, 105-107 (1985) (failure to define "malice" coupled with an erroneous but more favorable instruction on first degree murder not prejudicial).

Although the defendant now argues that the instruction given on voluntary manslaughter was also inadequate, no objection was taken at trial. Therefore, our review is limited to determining whether the instruction was so flawed as to pose "a substantial risk of a miscarriage of justice." *Commonwealth* v. *Freeman,* 352 Mass. 556, 564 (1967). The instruction contains no such error.[3]

2. *Voluntariness of Statements and Waiver of Right to Counsel.*

The defendant claims that the judge erred in denying his pretrial motion to suppress the admissions he made to police. He argues the following grounds for suppression: (1) the police violated the defendant's Miranda rights by failing to give a fresh set of warnings before shifting interrogation from the theft of the beeper to the victim's homicide; (2) despite subse-

---

[3] See note 2, *supra.*

quent Miranda warnings the defendant's statements were tainted by this illegality and therefore inadmissible; (3) the police used the results of an allegedly erroneous polygraph examination to coerce the defendant into making admissions; and (4) in light of these circumstances and the defendant's subnormal intelligence, his waiver of his Miranda rights was ineffective and his subsequent statements involuntary.

After three days of pretrial evidentiary hearings, the judge denied the defendant's motion to suppress without making explicit findings. We recognize that the issue of waiver of the right to counsel (the Miranda issue) is separate and distinct from the issue of the voluntariness of the defendant's statements. See *Commonwealth* v. *Parham,* 390 Mass. 833, 838 (1984); *Commonwealth* v. *Williams,* 388 Mass. 846, 851 (1983); *Commonwealth* v. *Tavares,* 385 Mass. 140, 145, cert. denied, 457 U.S. 1137 (1982). Nevertheless, it is clear from the record, despite the absence of specific findings, that the judge here considered and ruled upon both of these constitutional issues in denying the defendant's motion. In these circumstances, such a denial implies findings "that the defendant understood the Miranda warnings, that he knowingly and intelligently waived his rights thereunder and elected to make the statements in question to the police, and that the statements were made by him freely and voluntarily." *Commonwealth* v. *Garcia,* 379 Mass. 422, 431 (1980). See *Parham, supra* at 838 ("[J]udge's decision to admit the defendant's statements renders the judge's conclusions as to voluntariness 'clearly evident from the record'"). It is also clear that, although the judge was dealing with two distinct issues, all the evidence before him at the pretrial hearing had relevance to both. See *Williams, supra* at 856 ("totality of relevant circumstances" indicated both validity of waiver and voluntariness of the defendant's statements).

We first consider whether the police were required to readvise the defendant of his Miranda rights before asking him any questions concerning Lawrence's death. The defendant was initially told that the police were investigating the theft of the beeper and agreed to accompany them to headquarters for

questioning. There he was warned of his Miranda rights and indicated that he understood those rights and was willing to speak with police. After denying that he had stolen the beeper, the defendant was asked whether he knew the victim and admitted that he did. One of the detectives then informed the defendant that the beeper had been found in the victim's apartment and suggested that the defendant was responsible for Lawrence's death. The defendant then admitted taking the beeper and meeting with Lawrence on December 22, 1979, but denied ever fighting with him or going to his apartment. It was only after voluntarily submitting to a polygraph examination and receiving two additional sets of Miranda warnings, that the defendant gave police his version of the events of December 23, 1979.

Relying on the authority of *Michigan* v. *Mosley,* 423 U.S. 96 (1975), and *Commonwealth* v. *Taylor,* 374 Mass. 426 (1978), the defendant argues that, once the accused has received Miranda warnings prior to an interrogation concerning one crime, he cannot be questioned about an unrelated crime unless he is first given fresh warnings. We leave aside for the time being whether the theft and homicide in this case were "unrelated" crimes. While the crimes occurred at different times and places, their investigations were interrelated as a result of the discovery of the beeper in Lawrence's apartment. In any event, the cases relied on by the defendant are inapposite. *Mosley* and *Taylor* concern a defendant's right to remain silent and thereby cut off police questioning. The rule established in *Mosley, supra* at 106, is that police may resume questioning "only after the passage of a significant period of time and the provision of a fresh set of warnings," and only when the second interrogation is restricted "to a crime that had not been a subject of the earlier interrogation." See *Taylor, supra* at 433. Here, however, there is no allegation that the defendant ever exercised his right to remain silent. Therefore, *Mosley* is not controlling. See *United States ex rel. Henne* v. *Fike,* 563 F.2d 809, 814 (7th Cir. 1977), cert. denied, 434 U.S. 1072 (1978) (*Mosley* inapposite where defendant, who has not exercised right to remain silent, is questioned about second crime).

The prevailing view of relevant authority is that *Miranda* v. *Arizona,* 384 U.S. 436 (1966), does not require police to inform a suspect of the nature of the crime about which he is to be interrogated and therefore does not entitle the defendant to new warnings if the questioning turns to a different crime. See *Carter* v. *Garrison,* 656 F.2d 68 (4th Cir. 1981); *Fike, supra*; *Collins* v. *Brierly,* 492 F.2d 735 (3d Cir.), cert. denied, 419 U.S. 877 (1974); *United States* v. *Poole,* 495 F.2d 115, 119 n.5 (D.C. Cir. 1974), cert. denied, 422 U.S. 1048 (1975); *United States* v. *Ferguson,* 538 F. Supp. 1216 (E.D. Wis. 1982). See also W.R. LaFave & J.H. Israel, Criminal Procedure § 6.8, at 522-523 (1984). While we have not had occasion to consider this precise issue, we have declined "to impose an additional [*Miranda*] requirement that police officers must advise a defendant that he is charged with a crime or that he is a suspect before a valid waiver may be obtained." *Commonwealth* v. *Amazeen,* 375 Mass. 73, 78 (1978). Nor have we required new warnings when, as a result of a defendant's inculpatory responses to noncustodial interrogation, suspicion becomes centered on the defendant and custodial interrogation begins. *Commonwealth* v. *Alicea,* 376 Mass. 506, 513-514 (1978). Although it would "have been cleaner practice to inform the defendant explicitly" of police suspicions at the outset, and prior to questioning him about Lawrence's death "to give him his Miranda rights again then and there," *id.* at 514, we conclude that the police were not constitutionally required to do so. This, however, does not end our inquiry into the validity of the defendant's waiver of rights.

To determine whether the defendant's waiver was knowing, intelligent, and voluntary we must examine the totality of the circumstances. "The suspect's ignorance of the exact subject of the interrogation accordingly becomes one part of the court's evaluation of the total circumstances." *Carter, supra* at 70. *Collins, supra* at 739. "[A]ny evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his [rights]." *Miranda, supra* at 476.

The evidence suggests that the defendant was interrogated in a professional, noncoercive manner. Miranda warnings "were first given before the situation became custodial, and may be understood as a step out of abundant caution to counteract any coercive element inhering in an interview at a police station." *Alicea, supra* at 513. After the questioning shifted to Lawrence's murder, two additional sets of warnings were given and the defendant signed two separate waiver forms.

There is no evidence of deliberate trickery or deceit on the part of the police. At the time of the defendant's interrogation Lawrence's death was considered a suicide. There were no witnesses to place the defendant at the scene. The detectives apparently sought to discover evidence linking the beeper theft to the victim's death through interrogating the defendant and confronted him with their "theory of the beeper" with this end in mind. To preclude police from pursuing their investigations by means of interrogation would unjustifiably impede law enforcement efforts.

Moreover, under these circumstances, the defendant was unlikely to have been misled into making the admissions he seeks to suppress. He knew that he had left the beeper in Lawrence's apartment, which helps to explain why he was so upset when the police came to question him about the beeper. We are not confronted with a case in which the police surprised the accused by providing warnings with regard to one offense and then shifting the interrogation to the subject of a totally unrelated crime. Cf. *United States* v. *McCrary,* 643 F.2d 323, 329 (5th Cir. 1981) (waiver may be invalid where defendant "had no reason to suspect" he would be questioned about an entirely unrelated offense). The situation here is analogous to *Carter* v. *Garrison,* 656 F.2d 68 (4th Cir. 1981). In that case the defendant challenged the validity of a waiver given prior to being interrogated about a break-in. He sought to suppress incriminating statements he made after the questioning shifted to a homicide committed at the site of the break-in. As in this case, the evidence which implicated the defendant in the break-in also linked him to the homicide. In upholding the waiver, the court examined the totality of the circumstances including

the defendant's subjective knowledge of the relation between the crimes; his right to stop answering questions once the focus of the interrogation shifted; and the lack of any evidence of force or threats by police. *Id.* at 70. The same circumstances are present in this case. However, the defendant contends that the additional factor of his "subnormal intelligence" is reason to find his waiver ineffective. We disagree.

At the hearing the defense submitted a school record dating back to 1971, when the defendant attended the Donaghy School for special needs students, which indicated that while at the school the defendant read at a primer level (i.e., below first grade) and tested at an IQ of 70. No expert psychiatric testimony was given, either at the hearing or later at trial, to establish the defendant's mental abilities as of 1980, when his interrogation took place. Although the evidence before the motion judge on the issue of the defendant's intelligence was insubstantial, we assume it entered into his evaluation of the totality of the circumstances. *Commonwealth* v. *Daniels,* 366 Mass. 601, 606 (1975).

"A mentally deficient adult may make an effective waiver of his rights and render a voluntary, knowing, and admissible confession." *Commonwealth* v. *Cameron,* 385 Mass. 660, 665 (1982). After "scrutiniz[ing] the record with special care," *id.* at 664, we conclude that the defendant's diminished mental capacity did not prevent him from effectively waiving his rights. There was no evidence that the defendant could not comprehend and understand his Miranda rights. He was not "suffering an active mental disease or personality disturbance." *Commonwealth* v. *White,* 362 Mass. 193, 196 (1972). He lived independently and had previous experience with the law. See *Commonwealth* v. *Davis,* 380 Mass. 1, 4-6 (1980) (mentally deficient defendant with years of worldly experience and prior contact with law effectively waived rights). Police officers advised the defendant of his rights on three different occasions. They slowly explained and paraphrased each right and asked the defendant whether he understood its meaning. After appearing to read two waiver forms, the defendant signed his name to them. When his statement was read to other officers, the

defendant interjected his corrections and comments. Such evidence is sufficient to show that police did not take advantage of his low intelligence to either coerce or trick him into waiving his rights. See *Commonwealth* v. *Cameron,* 385 Mass. 660, 665 (1982) (where defendant with limited intelligence was read his rights in simplified language, his confession was voluntarily given).

Finally, the defendant argues that the police used erroneous results of his polygraph test to coerce his inculpatory statements. He contends that the test was inaccurate due to the inexperience of the examiner and the defendant's own nervous condition. However, the only proof of these accusations is the examiner's allegedly inconsistent interpretations of two of the defendant's answers. Because neither of these answers was brought to the defendant's attention, this information could not have been used to induce his subsequent admissions.

The police discussed four of the polygraph questions with the defendant which, according to the examiner's conclusions, had been answered deceptively. All four questions concerned his association with Lawrence prior to his death.[4] Based on the defendant's own admissions, his answers to these questions were either untrue or deceptive.

The defendant is not appealing the use of polygraph evidence to prove his guilt at trial. *Commonwealth* v. *Vitello,* 376 Mass. 426, 450-453 (1978). Rather, he claims that police should be precluded from using allegedly deceptive polygraph results to coax a suspect into making admissions. We do not view this practice as coercive per se. "Where the evidence shows that before he confessed the defendant took a lie detector test, if it was taken willingly, neither the fact it was given nor the fact that the defendant was told by the test giver it revealed in his opinion that the defendant was not telling the truth, inherently demonstrates coercion." *People* v. *Brown,* 119 Cal. App. 3d 116, 127 (1981), and cases cited. See *Sotelo* v. *State,* 264 Ind. 298, 303-304 (1976) (where no flagrant misstatements to defendant of test results, subsequent admissions, although

---

[4] See note 1, *supra.*

coaxed, were not coerced). "To hold otherwise and to hold that upon the completion of such a polygraph examination the police may not inform the person who has taken the examination that it appears from the polygraph that he has been deceptive would, as a practical matter, foreclose the effective use of polygraph examinations by the police in the investigation of crime." *State* v. *Clifton,* 271 Or. 177, 181 (1975). Decisions relied on by the defendant, which hold that confessions obtained as a result of a polygraph examination are inadmissible, are distinguishable by virtue of either the existence of oppressive interrogation and testing conditions, *People* v. *Leonard,* 59 A.D.2d 1 (N.Y. 1977); *United States ex rel. Monks* v. *Warden, N.J. State Prison,* 339 F. Supp. 30 (D.N.J. 1972), or allegations of physical abuse, bribes, or threats by police. *Leonard, supra. People* v. *Sammons,* 17 Ill.2d 316 (1959).

Upon review of the totality of the circumstances surrounding the defendant's admissions, we conclude that the evidence at the hearing fully supported the judge's implied findings that the defendant's waiver of rights was effective and his subsequent statements voluntarily given. Consequently, there was no error in the judge's denial of the motion to suppress.

3. *Judge's Charge on Death Penalty.*

The defendant contends that it was reversible error for the judge to instruct the jury that Massachusetts does not have a death penalty.[5] "We have long held that the sentencing conse-

---

[5] The relevant section of the judge's charge reads as follows: "So, we have in Massachusetts two types of murder — murder in the first degree, murder in the second degree, and the other, unlawful homicide, is called manslaughter. Now I'm going to discuss now with you what makes those crimes different — the one from the other — Murder 1, Murder 2 and manslaughter. In my discussion of them have this in mind. We do not have in this Commonwealth, as you may or may not know, any death penalty. Although at certain times you read that Murder 1 cases — first degree murder cases are called capital offenses, they are not capital offenses because the capital offense is an offense where the death penalty is exact. We do not have that, but moreover than that, in cases of this kind such as you have been hearing for the past several days, the disposition of a case on a guilty finding is of no concern to you.

"That may seem harsh to say — it's of no concern to you — but I hasten to add that when I say that, I do not indicate in any way whether you should or

quences of a verdict may not be submitted to the jury because the jury's function is to reach a verdict based solely on the evidence presented to them considered in the light of the judge's charge to them concerning the applicable legal standards." *Commonwealth* v. *Smallwood,* 379 Mass. 878, 882 (1980). *Commonwealth* v. *Ferreira,* 373 Mass. 116, 124 (1977). Not every violation of this rule, however, warrants reversal of the jury's verdict. First of all, we consider it highly significant that the jury returned a verdict of murder in the second degree. This serves to invalidate any argument that the judge's erroneous charge was a subtle encouragement, albeit unintentional, for a jury verdict of murder in the first degree. There are other relevant considerations, also. In *Smallwood, supra* at 883, we held that reversal was not required by the judge's statement that, regardless of the verdict, the death penalty could not lawfully be imposed in Massachusetts for the crime with which the defendant was charged. We stressed that although his instruction was "ill-advised," the judge was seeking to "clarify for the jury the status of the death penalty, particularly because of extensive news reporting of recent legislative proposals. Thus the judge's instruction was an effort to remove extraneous considerations by clarifying what the sentence would not be." *Id.* We can assume the judge in this case was motivated by similar concerns. Just six weeks prior to his charge, this court struck down the death penalty as unconstitutionally cruel punishment, *District Attorney for the Suffolk Dist.* v. *Watson,* 381 Mass. 648 (1980), a decision which received considerable attention.

Moreover, as in *Smallwood, supra* at 883, the "judge minimized any untoward influence that this portion of the charge might have had on the jury" by delimiting the scope of their deliberations. He explained to the jury that "the disposition of a case on a guilty finding is of no concern to you. . . . [T]raditionally under our system it is the judge who disposes

should not return a guilty or not guilty verdict; but traditionally under our system it is the judge who disposes of cases where there is a guilty finding and not the jury. The only time the jury is even told about penalties are in a type of case which is far removed from this particular case."

of cases where there is a guilty finding and not the jury." He also instructed the jury that they are "the sole judges of the facts of the case, and while you must take the law as I give it to you, I have no right to suggest the value or the lack of value, the strengths or the weakness of any facts, or to call to your attention any of the facts except to illustrate a point of law." In light of these mitigating factors, we conclude that the judge's unfortunate reference to the death penalty does not amount to error of reversible magnitude.

4. *Photograph of the Deceased.*

A photograph of the deceased, depicting the position and depth of the injuries to his neck, was admitted during the testimony of Dr. Keeley. The defendant contends that the judge erred in admitting this picture because it had no probative value and was highly inflammatory. "The fact that photographs may be inflammatory does not render them inadmissible if they possess evidential value on a material matter. . . . The determination whether a photograph possesses such value is within the discretion of the trial judge." *Commonwealth* v. *Stewart,* 375 Mass. 380, 385 (1978). The defendant has conceded that the burden of demonstrating an abuse of discretion is a heavy one. On appellate review "[t]he question is not whether we . . . should have made an opposite decision from that made by the trial judge. To sustain . . . [the claim] it is necessary to decide that no conscientious judge, acting intelligently, could honestly have taken the view expressed by him." *Commonwealth* v. *Bys,* 370 Mass. 350, 361 (1976), quoting *Davis* v. *Boston Elevated Ry.,* 235 Mass. 482, 502 (1920).

The judge agreed to admit the photograph after viewing and rejecting several others which he considered too inflammatory. He also conducted a voir dire of the pathologist, outside the presence of the jury, to determine whether the photograph would be of assistance to the jury in understanding and evaluating his medical testimony. See *Commonwealth* v. *Chalifoux,* 362 Mass. 811, 817 (1973) (photograph of victim admissible to corroborate testimony); *Commonwealth* v. *Woods,* 339 Mass. 7, 10 (1959) (photograph of deceased child admissible to aid testimony of pathologist).

The defendant argues that the photograph was not an accurate depiction of the victim's injuries because it also revealed aspects of post-mortem decomposition. Relying on the authority of *Commonwealth* v. *Richmond,* 371 Mass. 563 (1976), he claims that reversal is in order. In *Richmond,* however, the challenged photograph illustrated gruesome injuries to the victim's face, most of which were inflicted post-mortem rather than as a result of the alleged assault and rape by the defendant. In this case, the judge sought to minimize any possible prejudicial effect by excluding photographs that unnecessarily showed the results of post-mortem decomposition and admitting that photograph which best depicted the victim's fatal injuries. In addition, the judge minimized the effect of the photograph in his limiting instruction to the jury. See *Commonwealth* v. *Boudreau,* 362 Mass. 378, 379 (1972). Finally, and most importantly, the judge was entitled to consider that the primary issue in the trial was the cause of the victim's injuries and death. This factor could properly be considered as weighing significantly toward admissibility of the photographs. See *Chalifoux, supra* at 817 (photographs of victim admissible to disprove defendant's explanation of injuries); *Commonwealth* v. *Boudreau, supra* at 379 (photographs aided jury in understanding nature of fatal injuries). For these reasons, we conclude that no abuse of discretion has been shown in this case.

5. *Other Alleged Errors.*

The defendant has called our attention to a number of other purported errors, which although not preserved by objections at trial, allegedly pose a substantial likelihood of a miscarriage of justice.[6] We are not persuaded by the defendant's argument

[6] Although he seeks relief under G. L. c. 278, § 33E, that law, as amended by St. 1979, c. 346, § 2, limits our special review powers to cases resulting in first degree murder convictions. In construing St. 1979, c. 346, § 2, we have held that review under § 33E remains available where the offense resulting in a second degree murder conviction, upon an indictment in the first degree, was committed before July 1, 1979. *Commonwealth* v. *Davis,* 380 Mass. 1, 16 (1980). However, in the instant case the offense was committed on or about December 23, 1979. Therefore, as to those claims not properly preserved below, we must determine whether "there is a substantial risk of a miscarriage of justice" under the doctrine of *Commonwealth* v. *Freeman,* 352 Mass. 556, 564 (1967).

that factual inconsistencies in the testimony, particularly regarding the victim's cause of death, warrant reversal of the defendant's conviction. As we have stated on numerous occasions, "[i]nconsistencies in testimony . . . do not render it insufficient. The issue of credibility raised by such inconsistencies 'is a question for the jury to decide.'" *Commonwealth* v. *Clary,* 388 Mass. 583, 589 (1983), quoting *Commonwealth* v. *Fitzgerald,* 376 Mass. 402, 411 (1978).

The only other issue deserving further comment is the defendant's contention that the judge erroneously instructed the jury with regard to the Commonwealth's burden of proving the voluntariness of the defendant's admissions. In his charge the judge stated in part "that anything that a defendant says has to be voluntary, he has to know what he's doing and speak voluntarily. . . . [T]he police can't con a man into saying something he doesn't want to say. . . . [T]he statement of anybody being questioned by the police must be an intelligent and voluntary act." Because *Commonwealth* v. *Tavares,* 385 Mass. 140, 152 (1982), requires the Commonwealth to prove beyond a reasonable doubt the voluntariness of a defendant's admissions, the defendant argues that the instruction was fatally flawed. However, in *Commonwealth* v. *Paszko,* 391 Mass. 164, 182 (1984), we held "that admissions introduced at trials conducted prior to our decision in *Tavares* are not subject to [this] 'humane practice.'" The trial in the instant case preceded *Tavares.* Consequently, there was no error in the judge's charge. Furthermore, by instructing the jury that they had to find the defendant's pretrial statements were voluntary and not "conned," the judge avoided any "substantial risk of a miscarriage of justice." *Commonwealth* v. *Freeman, supra* at 564.

*Judgment affirmed.*