COMMONWEALTH *vs*. WILLIAM MARQUETTY.

No. 88-P-1202.

Norfolk. December 8, 1989. - June 13, 1990.

Present: PERRETTA, KAPLAN, & FINE, JJ.

*Constitutional Law*, Admissions and confessions, Waiver of constitutional rights. *Waiver. Practice, Criminal*, Trial of indictments together.

At the trial of indictments for assault and battery with a dangerous weapon and assault with intent to murder involving four victims, the judge's findings, based on the evidence the judge found credible, supported his determination that the defendant knowingly, intelligently, and voluntarily waived his Miranda rights before making statements to the police after his arrest. [694-696]

Eight indictments for assault and battery with a dangerous weapon and assault with intent to murder involving four victims attacked in a certain area within a three-week period were properly joined for trial where the evidence of the crimes was relevant to prove the identity of the assailant. [696]

INDICTMENTS found and returned in the Superior Court Department on May 5, 1987.

The cases were tried before *Roger J. Donahue*, J.

*James A. Couture* for the defendant.

*James F. Lang*, Assistant District Attorney, for the Commonwealth.

PERRETTA, J. Between December 30, 1986, and January 19, 1987, four women were attacked and stabbed while walking in Quincy and Milton. A jury found the defendant guilty on eight indictments charging him, as to each of the victims, with assault and battery with a dangerous weapon, a knife, and assault with intent to murder. On appeal he argues that certain statements made by him to the police were elicited in violation of his Miranda rights and that the indictments concerning one of the victims should have been severed from the others for trial. We affirm the convictions.

## I. *The Crimes.*

Consideration of the issues raised on this appeal does not require a detailed recital of the evidence presented. It is sufficient to relate, as background, that over a three-week period, four women were attacked as they were either walking or jogging in residential areas of Quincy and Milton. Three of the four attacks occurred between January 15 and January 19, 1987. Each of the victims was white, and three saw their assailant's face. Each of the three described the attacker as either Hispanic or light-skinned black. In each instance, the man would approach the victim and, without saying a word, suddenly stab her in the upper part of her body. Three of the women were stabbed twice. No attempt was made to rob any of them.

## II. *The Defendant's Statements.*

Just as the trial was about to begin, the prosecutor advised the judge that police officers would testify to statements made by the defendant while in custody. Although the statements had been provided to defense counsel, a motion to suppress had not been filed nor had any pretrial request for a hearing been made. The judge, on his own initiative, decided to conduct a hearing on the issue of the voluntariness of the statements.[1] See *Commonwealth* v. *Rubio,* 27 Mass. App. Ct. 506, 511 (1989). We relate the facts on this question as he found them, supplemented by us with some details from the transcript.

On March 20, 1987, Ann Gillietti was stabbed to death in her Roslindale apartment. Although her murder is not in issue in this case, it plays a role in that the defendant, for

---

[1] The defendant's trial attorney, who is not appellate counsel, may well have had a tactical reason for not moving to suppress the statements. As will be seen, the statements are not overwhelmingly inculpatory, especially when viewed in light of the other evidence against the defendant. On the other hand, the statements could be regarded as indicative of some form of mental disorder. Indeed, shortly after the jury began their deliberations, they returned to ask the judge whether they "[s]hould . . . consider the possibility that the defendant was sick to arrive at a decision of guilt or innocence?" In any event, trial counsel did not object to the judge's decision to conduct the hearing, and appellate counsel now argues that the statements should have been suppressed.

reasons not here pertinent, was a suspect from the outset. On March 22, Boston police detective Kenneth Acerra, fluent in Spanish and English, interviewed the defendant about the murder, first advising him of his Miranda rights. Two days later, Acerra obtained a search warrant for the defendant's apartment in New Bedford. In the course of executing the warrant, the police found evidence incriminating the defendant in the Gillietti murder. They arrested the defendant, placed him in a cruiser, and continued their search.

Because the defendant's wife was upset and crying, the defendant asked to speak with Acerra. When he went over to the cruiser, the defendant said to him, "I did it. Why don't we get out of here?" Acerra told him that they could not leave because they were still searching for the knife. He advised the defendant of his Miranda rights. The defendant told him where the knife was hidden and that he could take it. He extended his hand to Acerra and offered his congratulations in apprehending him.

As the police were about to leave to return to Boston, the defendant asked Acerra to get certain books from his wife for him. When Acerra returned to the cruiser with the books, the defendant refused them, telling Acerra they were for him. He wanted Acerra to read the books so that he could come to understand him. During the ride to Boston, Acerra asked the defendant what the books were about. The defendant responded, "Killing women, murder, spies, police investigations." The defendant began to cry, stating, "I'm sick. I don't know what's wrong with me."

Acerra asked the defendant whether he always carried the knife that they had seized. The defendant not only stated that he did, he went on to relate that he knew how to use the knife properly to kill a person, that is, the knife must be pushed in and thrust up. He then began to make general conversation about the recent stabbings of women.

Sensing that the defendant was referring to the women in Quincy and Milton, Acerra said, "Did you stab the women in Quincy?" At first the defendant said "Yes." However, that statement was quickly followed by a denial: "Quincy? No.

No. I didn't do Quincy." He related to Acerra his anger with the Quincy police. They had arrested him on a traffic warrant when he knew that he was being arrested as a suspect in the stabbings. However, he had been able to stay "one step ahead" of the Quincy police because of the media coverage concerning the investigation.

According to both Acerra and the defendant, at no time during the ride from New Bedford to Boston did the defendant request or otherwise indicate that he wished to speak with an attorney.[2] Upon his arrival at the Boston police station, the defendant was again advised of his Miranda rights and questioned about the Gillietti murder. At the conclusion of his confession to that murder, the defendant renewed his complaints about the Quincy police and his anger over what he believed to be their arresting him on a pretext.

Acerra asked the defendant whether, in view of his murder confession, he wished to admit those attacks, Quincy and Milton, and "pull . . . all the cases together." As described by Acerra, the defendant "admitted it with a smile" but said: "If you are going to charge me for anything to do with Quincy, I want a lawyer. They had me and they let me go."[3] Questioning of the defendant stopped.

The next morning, Quincy and Milton police officers arrived at the Boston police station. They informed the defendant that he was a suspect in the four stabbings and advised him of his Miranda rights. The defendant informed the officers: "I don't want to say yes. I don't want to say no. I will talk to my lawyer and maybe he will call you." The conversation ended immediately.

---

[2] The judge found that the defendant told Acerra during the ride that if Acerra wanted to talk about Quincy, he wanted a lawyer. However, the transcript shows that the defendant made this statement at the police station after he confessed to the Gillietti murder. As will be seen, any error in this finding by the judge is immaterial to our conclusion.

[3] As we read the transcript and the judge's findings, it is this statement which the judge erroneously found to have been made in the police cruiser rather than at the police station. See note 2, *supra*.

III. *The Admissibility of the Statements.*

With the one exception pointed out in notes 2 and 3, *supra*, we accept the judge's findings, as they are supported by the evidence. The defendant's passing references in his brief to testimony which supports his arguments ignore the well established rule that the "determination of the weight and credibility of the testimony is the function and responsibility of the judge who saw and heard the witnesses, and not of this court." *Commonwealth* v. *Moon*, 380 Mass. 751, 756 (1980), and cases therein cited. See also *Commonwealth* v. *Hine*, 393 Mass. 564, 568 (1984).

It is clear from Acerra's testimony, found credible by the judge, that he advised the defendant of his Miranda rights before they left New Bedford for Boston. And, as both Acerra and the defendant testified, the defendant did not invoke his right to remain silent or to consult an attorney before speaking. It is also clear from the evidence and the judge's findings that the defendant did make a statement during the ride about the stabbings in Quincy and Milton. What is not entirely clear, however, is whether Acerra or the defendant initiated the discussion on that topic.

As we understand the defendant's argument, the crucial question is not who initiated that conversation. Rather, his argument proceeds on the premise that because he had been arrested and advised of his Miranda rights in respect to the Gillietti murder, Acerra could ask him nothing about the stabbings, irrespective of how the topic came up, without first giving him fresh Miranda warnings in connection with the different offenses.

"Even if the evidence supported the defendant's argument, the law does not. 'The prevailing view of the relevant authority is that *Miranda* v. *Arizona*, 384 U.S. 436 (1966), does not require police to inform a suspect of the nature of the crime about which he is to be interrogated.' *Commonwealth* v. *Medeiros*, 395 Mass. 336, 345 (1985). Additionally, we decline to impose a requirement that, before a statement may be considered to be voluntary, a suspect must be advised of his status as such or that he is charged with a particular

crime. See *Commonwealth* v. *Amazeen*, 375 Mass. 73, 78-79 (1978)." *Commonwealth* v. *Wills*, 398 Mass. 768, 777 (1986).

Attempts by the defendant to distinguish *Commonwealth* v. *Medeiros*, 395 Mass. 336 (1985), and *Wills*, *supra*, on the basis that the Gillietti murder and the stabbings were unrelated crimes, miss the controlling point of the cases: "To determine whether the defendant's waiver was knowing, intelligent, and voluntary we must examine the totality of the circumstances. 'The suspect's ignorance of the exact subject of the interrogation accordingly becomes one part of the court's evaluation of the total circumstances.' *Carter* v. [*Garrison*, 656 F.2d 68, 70 (4th Cir. 1981)]. *Collins [v. Brierly*, 492 F.2d 735, 739 (3d Cir.), cert. denied, 419 U.S. 877 (1974)]. '[A]ny evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his [rights].' *Miranda*, *supra* at 476." *Commonwealth* v. *Medeiros*, 395 Mass. at 345.

As found by the judge, the defendant had lived in the United States since 1980, he reads and speaks Spanish and English, his Miranda rights were given to him in both languages, and he is intelligent and alert. According to the defendant's own testimony the police used no "force, undue persuasions, or trickery" at any time during their questioning of him.

After confessing to the Gillietti murder at the Boston police station, the defendant did give clear expression of the fact that if the police were going to charge him with the stabbings, he wanted a lawyer. Although the Boston police went no further with any questions, the Quincy and Milton police appeared the next morning to speak with him. Even if we assume that these events show that the Miranda warnings and procedures were not "scrupulously observed," *Commonwealth* v. *Corriveau*, 396 Mass. 319, 330 (1985), we would be hard put to hold that the defendant's conviction must be reversed on this score. The defendant's statement, "I don't want to say yes. I don't want to say no," was equivocal, and

the evidence of his guilt was substantial. Any error in admitting that statement in evidence was harmless beyond a reasonable doubt. See *Commonwealth* v. *DiMuro, ante* 223, 228 (1990).

IV. *Joinder.*

It is the defendant's claim that because the fourth stabbing victim was unable to identify the defendant as her assailant, the indictments pertaining to the crimes against her should not have been joined for trial with the others. See Mass.R.Crim.P. 9(d), 378 Mass. 860 (1979). We agree that, as to the fourth victim, the identification evidence was less than solid. The victim did not get a good look at her assailant's face as he stabbed her, and there were no witnesses to the attack. However, she was able to identify a blue parka taken from the defendant as resembling the one worn by the attacker. Further, just minutes after the attack, a witness saw a car proceeding down the street where the attack had taken place. As described by the witness, the car was similar in several respects to that of the defendant.

Because of the weakness of this identification evidence, the defendant argues, the jury must have considered the evidence pertaining to the other three stabbings in deciding that the fourth victim's assailant was the defendant. If the jury reasoned as the defendant claims, and we think it likely that they did, there was no error. "[E]vidence of unconnected crimes may be admitted for other relevant probative purposes . . . [citations omitted]. One such purpose is for proof of identity of the defendant . . . [citations omitted]." *Commonwealth* v. *Madyun,* 17 Mass. App. Ct. 965, 966 (1983). The defendant does not complain about the jury instructions on this matter, he does not (and cannot) allege that the crimes are remote in time from each other, and he makes no argument that the evidence of the other three attacks would be inadmissible at a separate trial on the indictments relating to the fourth victim. See *Commonwealth* v. *Mamay,* 407 Mass. 412, 416-418 (1990).

*Judgments affirmed.*