COMMONWEALTH vs. BRADLEY W. CHANDLER.

No. 89-P-1240.

Franklin. March 5, 1990. - December 3, 1990.

Present: ARMSTRONG, PERRETTA, & SMITH, JJ.

*Evidence*, Admissions and confessions. *Constitutional Law*, Admissions and confessions, Waiver of constitutional rights, Search and seizure, Self-incrimination. *Waiver. Mental Impairment. Search and Seizure*, Warrant, Return. *Practice, Criminal*, Verdict, Instructions to jury.

At the hearing on a criminal defendant's motion to suppress his statement to police, the judge was warranted in finding, on conflicting testimony, that the police made no threats to the defendant or promises of a "deal," and the judge correctly ruled that the police were under no obligation to volunteer certain legal advice to the defendant. [576-578]

At a hearing on a criminal defendant's motion to suppress his statement to police, the judge was warranted in finding that the defendant's statement was voluntary and that the police complied with all requirements of the *Miranda* decision. [578-579]

A certain error in the return of a valid search warrant, found by a judge to be harmless, did not render unlawful the searches conducted pursuant to the warrant. [579-580]

The verdicts returned by a jury (not guilty of murder by reason of insanity and guilty of unlawfully carrying a firearm) were not inconsistent and impossible as matter of law. [580-581]

Reversal of a criminal conviction was not required on the ground that certain verdict slips provided to the jury were erroneously drawn, where the judge's instructions adequately explained the verdicts that were open to them. [581-582]

At the trial of a criminal case, no error appeared in the judge's instructions, considered in their entirety, with respect to a defendant's right not to testify, even though the better course would have been for the judge to have refrained from using references to the defendant's "neglect" or "refusal" to testify. [582-583]

INDICTMENT found and returned in the Superior Court Department on June 4, 1986.

Motions to suppress evidence were heard by *George C. Keady, Jr.*, J., and the case was tried before him.

*Wendy Sibbison* for the defendant.

*Ariane D. Vuono*, Assistant District Attorney, for the Commonwealth.

SMITH, J. On June 19, 1987, after a trial by jury, the defendant was found not guilty by reason of insanity of first degree murder, but guilty of unlawfully carrying a firearm, G. L. c. 269, § 10(*a*)(1).[1] He appeals from that conviction on the grounds that (1) his suppression motions were erroneously denied; (2) the verdict slips were erroneously drawn; (3) the judge committed error in his jury instructions; and (4) the verdicts were inconsistent.

We summarize the evidence on which the jury could have based their verdict. On May 24, 1986, shortly after 1:00 A.M., the body of the victim was discovered in a parking lot in Greenfield. Two gunshot wounds from a black powder handgun were found to have caused his death. Two days later, the defendant told the police that he had killed the victim.

In his confession, the defendant stated that he had become acquainted with the victim while both were serving sentences at the Franklin County house of correction. On several occasions during that period, according to the defendant, the victim had threatened him and sexually assaulted him. Further, the victim had caused several other prisoners to beat the defendant by falsely accusing him of being a "snitch."

Both the victim and the defendant were eventually released from the house of correction. They did not see each other until the evening of May 23, 1986. That night, while the defendant was visiting several bars, he saw the victim standing on a street corner. He ignored the victim and resumed his drinking, but he began to brood about the victim's conduct towards him during their incarceration.

---

[1] The jury also found the defendant guilty of possessing a firearm without a firearm identification card. The judge ordered the indictment filed with the consent of the defendant. There is no appeal from that conviction before us. *Commonwealth* v. *Sowers*, 388 Mass. 207, 208 n.1 (1983).

The judge entered a finding of not guilty on an indictment charging the defendant with obliterating the serial number of a firearm.

Subsequently, the defendant went home to get his two handguns, one a black powder pistol. He did not have a license to carry either gun. He returned downtown on his moped and proceeded to look for the victim. The defendant just wanted to "confront" the victim and he "wanted [his] gun there." At first, he could not find the victim, but, when the defendant went into a bar for a final beer, he saw him. The two engaged in conversation, and the victim brought up his old accusation that the defendant was a "snitch." Finally, when the victim said he wanted to get a taxicab and go to the defendant's apartment to get "high" with him, the defendant "at this point . . . knew that [he] was going to do something to him."

After midnight, the victim and the defendant left the bar and began walking to get a taxicab. The victim, according to the defendant, put his arms around the defendant, kissed him, and told the defendant that when they got to the apartment, he wanted the defendant to take his clothes off. The defendant decided at this point to kill the victim. He took out the black powder pistol and shot the victim twice in the head. He then fled the scene on his moped.

Later that morning — May 24 — the defendant went to his mother's home and told his brother, David, what he had done. David drove the defendant back to his apartment and they picked up the handguns. They then drove to a wooded area where the defendant buried the guns. While returning to the defendant's apartment, they were stopped by the police, and the defendant was arrested.

1. *Denial of suppression motions.* Prior to trial, the defendant filed two suppression motions, one motion to suppress his statement to the police, the other to suppress evidence obtained as a result of searches executed at the defendant's apartment and at the home of his mother.

a. *The defendant's statement.* The only evidence showing that the defendant unlawfully carried a handgun came from his confession. The defendant moved before trial to suppress his statement on the ground, among others, that the statement was not voluntary because it was induced by false

threats and promises concerning prosecution of the defendant's brother, coupled with implications of leniency in the defendant's own case. The defendant also claimed that his statement was not the product of a knowing and intelligent waiver of the rights protected by the Miranda warnings. See *Miranda* v. *Arizona*, 384 U.S. 436, 475 (1966).

During the motion hearing, the judge heard the testimony of several witnesses, including the defendant. After the hearing, the judge filed a comprehensive and thorough memorandum of decision that contained his findings of fact and rulings of law. We summarize the judge's findings.

After the defendant was arrested on May 24, he was brought to the Greenfield police station between 2:30 P.M. and 2:45 P.M. He was told that he was under arrest for murder and given Miranda warnings. He signed a card acknowledging that he had received the warnings. He did not request an attorney and did not refuse to answer questions.

The defendant was questioned for about one-half hour by Captain LaChance of the Greenfield police department and Trooper Kenney of the State police. He denied killing the victim. The exchange between Trooper Kenney and the defendant became heated, and Trooper Kenney broke off the interrogation. The defendant was booked and again given Miranda warnings.

The defendant's mother learned of his arrest from David at about 3:00 P.M. on May 24. She went to the police station and visited the defendant, leaving after about five minutes. She was worried about David's possible involvement in the crime, and her anxiety increased when she learned that the police planned to question David the following day.

On May 25, the defendant's mother went to the police station before David. She saw the defendant, and he told her that he had killed the victim because the victim had made his life miserable while both were in jail. When the mother left the defendant, she was still concerned about David's participation in the crime.

After David arrived at the police station, he spoke to his mother before he talked to the police. She told David that

the defendant had told her everything and that David should cooperate with the police or he would end up in a jail cell like his brother. David refused to tell the police of his involvement but did inform them that a certain green pouch they were seeking was at his mother's house. That pouch the police believed was used to carry the guns.

The defendant's mother accompanied Trooper Kenney to retrieve the pouch. On the way to the house, they did not discuss the case. However, as they returned to headquarters, the mother began to question Trooper Kenney about the effect of "mitigating circumstances" on a crime. Trooper Kenney told her that certain circumstances might change a charge from first degree to second degree murder. At her request, he explained the distinction between the two charges and the availability of parole on second degree murder. The mother then disclosed to Trooper Kenney that the defendant had told her that he had killed the victim but that there were mitigating circumstances.[2] She also told Trooper Kenney that David had given the defendant a ride to dispose of the weapon. The mother expressed her concern about the possible prosecution of David for his involvement in the disposal of the weapon. Trooper Kenney responded that if David's involvement was limited to giving the defendant a ride he probably would not be prosecuted.

Upon her return to the police station, the mother saw the defendant. She told him that she was very worried that, if the defendant failed to confess, David would be prosecuted for his participation in the disposal of the gun, and the defendant would be convicted of first degree murder without chance of parole. At the end of the meeting with his mother, the defendant sent for Trooper Kenney and said that he

---

[2] The defendant claims the discussion between his mother and Trooper Kenney concerning "mitigating circumstances" constituted an implied promise by Trooper Kenney that if the defendant confessed he would receive a lesser sentence. The judge's findings do not support that claim. The judge found that the defendant's mother initiated the conversation, not Trooper Kenney. Further, Trooper Kenney did no more than explain the varying degrees of homicide and what type of circumstances might be considered "mitigating."

would make a confession and agreed to have it videotape re-
corded. He then asked Trooper Kenney how David would be
treated by the authorities. Trooper Kenney said he would
check with the assistant district attorney. When Trooper
Kenney returned, he reported that the district attorney had
said that, if David's only participation was the ride to bury
the guns, he would not be prosecuted. The defendant's con-
fession was then videotaped. Before the taping commenced,
however, the defendant was again given the Miranda warn-
ings. At that time he signed a form which stated that he un-
derstood his rights and that he voluntarily waived the same.

Based upon his findings, the judge concluded that the de-
fendant's statement was voluntary and that the police com-
plied with all the requirements of the *Miranda* decision. Ac-
cordingly, the judge denied the motion to suppress.

"In reviewing a judge's determination regarding a knowing
waiver of Miranda rights and voluntariness, we 'grant sub-
stantial deference to the judge's ultimate conclusions and we
will not reject a judge's subsidiary findings if they are war-
ranted by the evidence.'" *Commonwealth* v. *Mandile*, 397
Mass. 410, 412 (1986), quoting from *Commonwealth* v. *Be-
noit*, 389 Mass. 411, 419 (1983). However, "[o]ur appellate
function requires that we make our own independent deter-
mination on the correctness of the judge's 'application of
constitutional principles to the facts as found . . . .'" *Com-
monwealth* v. *Haas*, 373 Mass. 545, 550 (1977), quoting
from *Brewer* v. *Williams*, 430 U.S. 387, 403 (1977).

The defendant claims that his confession was not a free
and voluntary act but rather resulted from a "deal" with the
police — he would confess to the murder if they would re-
frain from prosecuting his brother for his part in the disposal
of the guns. At the suppression hearing, both the defendant
and his mother testified that there was a "deal." Trooper
Kenney was also a witness at the hearing and testified that at
no time did the police make any such "deal" with the de-
fendant. The judge accepted Trooper Kenney's testimony
and found that the "police in no way coerced the defendant

. . . [nor] did the police offer either the defendant or his mother a 'deal' involving [the defendant] or David or both."

The judge was not required to believe the testimony offered by the defendant and his mother. *Commonwealth v. Day*, 387 Mass. 915, 919 (1983). Under our standard of review, "[w]here there has been conflicting testimony as to a particular event or series of events, a judge's resolution of such conflicting testimony invariably will be accepted." *Commonwealth v. Colon*, 408 Mass. 419, 426 (1990), quoting from *Commonwealth v. Yesilciman*, 406 Mass. 736, 743 (1990), and *Commonwealth v. Spagnolo*, 17 Mass. App. Ct. 516, 517-518 (1984). The defendant's claim that *Commonwealth v. Hunt*, 12 Mass. App. Ct. 841 (1981), controls is without merit. In *Hunt*, the motion judge found, on conflicting testimony, that the police made an implicit threat or promise that the defendant's wife would be released if he confessed and did not implicate her; otherwise, she would be sent to jail. The judge concluded that the defendant's statements were not his free and voluntary act and suppressed his confession. *Commonwealth v. Hunt, supra* at 844-845. Unlike the motion judge in *Hunt*, the trial judge in this case specifically found, on conflicting testimony, that the police made no threats or promises to the defendant.

The defendant claims that he was "tricked" into making a confession by Trooper Kenney's failure to inform him and his mother about G. L. c. 274, § 4. That statute concerns accessories after the fact and provides, in pertinent part, that "[t]he fact that the defendant is the . . . brother . . . of the offender, shall be a defence to a prosecution under this section." The judge ruled that "[t]he police were under no obligation to inform the defendant or his mother about . . . G. L. c. 274, § 4." We agree.

Here, the defendant had received Miranda warnings on more than one occasion. He had never invoked his right to silence and had never terminated the police interrogation. In these circumstances, it has been held that "a valid waiver does not require that an individual be informed of all information 'useful' in making his decision or all information that

'might . . . affec[t] his decision to confess.'" *Colorado v. Spring*, 479 U.S. 564, 576 (1987), quoting from *Moran v. Burbine*, 475 U.S. 412, 422 (1986). Further, the Supreme Court has "never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." *Id.* at 576-577. Also see *Commonwealth v. Cunningham*, 405 Mass. 646, 657 (1989)("no requirement the police must explain all possible legal ramifications [to the suspect] before a statement can be considered voluntary").

The defendant was aware that he was facing a murder charge when he made his decision to talk to the police without counsel. His mother knew that Trooper Kenney was a police officer, not a lawyer looking out for her son's interests. We know of no decision, and the defendant does not point us to any, holding that, in these circumstances, the police are required to volunteer legal advice to a suspect or to anyone else interested in his welfare.

The defendant argues that his decision to cut off further interrogation, shortly after he was arrested, was not honored by the police. In *Michigan v. Mosley*, 423 U.S. 96, 104 (1975), the Court ruled that statements obtained after a person in custody has decided to remain silent are inadmissible if the police have not "scrupulously honored" an accused's "right to cut off questioning." See also *Commonwealth v. Mandeville*, 386 Mass. 393, 402-404 (1982). The defendant argues that Trooper Kenney did not "scrupulously honor" the defendant's decision and, therefore, his confession must be suppressed. That claim is without merit. The judge found that Trooper Kenney, not the defendant, terminated the interrogation session that took place shortly after he was arrested. The defendant at no time invoked his right to silence.

The defendant claims that the police used his mother to pressure him into making a statement. The evidence was uncontradicted that it was the defendant's mother who requested that she be allowed to speak with the defendant. The record clearly demonstrates that the actions and the influence of the defendant's mother alone, not unfair police tac-

tics, prompted the defendant to confess. Contrast *Commonwealth* v. *Brant*, 380 Mass. 876, 883, cert. denied, 449 U.S. 1004 (1980).

The defendant argues that he was incapable of giving a voluntary waiver of his Miranda rights or incapable of making a voluntary statement because of his age and his history of mental instability.

The judge found that the defendant, twenty years old at the time, had "innate intelligence." The judge also noted that the defendant was no stranger to the criminal justice system, having been arrested on four prior occasions and having received the Miranda warnings on three prior occasions. See *Commonwealth* v. *Perrot*, 407 Mass. 539, 542-543 (1990)("defendant had at least ten prior encounters with the police, and, during those experiences, had been exposed time and again to the content of the Miranda warnings"). The record clearly supports the judge's finding that the defendant was "knowledgeable concerning his Miranda rights and fully appreciative of the serious situation he was in."

The judge also rejected the defendant's claim of mental instability. He found that the defendant was "calm" and "in full control of himself" when he gave the videotaped confession. Those findings were supported by the record.

b. *The search of the defendant's apartment.* At the suppression hearing, the defendant objected to the searches made by the police of his apartment and his mother's home. He requested that the evidence seized in those searches be suppressed. The judge allowed the motion in part. On appeal, the defendant's sole argument is that all the evidence seized from his apartment should have been suppressed because of an error in the return. The warrant was obtained by Captain LaChance, but he was not present at the search. However, he signed the return and, therefore, asserted that he had conducted the search himself. The judge found that the error in the return was harmless, and we agree.

"Any requirement . . . of an accurate return 'is not closely affiliated with any constitutional guarantee. . . .' " *Commonwealth* v. *Freiberg*, 405 Mass. 282, 300 (1989), quoting

from *Commonwealth* v. *Aldrich*, 23 Mass. App. Ct. 157, 162-163 (1986). The error, here, does not constitute a ground for voiding the otherwise lawful search.

2. *The inconsistent verdicts claim.* At trial, the defendant raised the defense of lack of criminal responsibility, colloquially known as an "insanity defense." He claims that the verdicts returned by the jury (not guilty of murder by reason of insanity and guilty of unlawfully carrying a firearm) are inconsistent and impossible as matter of law. The defendant argues that the jury's finding that the Commonwealth had not sustained its burden to prove the defendant was sane at the time of the murder, extends to the carrying offense, which, according to the defendant, occurred at the same time as the murder.

In Massachusetts, "[v]erdicts are inconsistent as a matter of law when a jury returns verdicts of guilty for mutually exclusive crimes." *Commonwealth* v. *Diaz*, 19 Mass. App. Ct. 29, 33 n.3 (1984). An example of inconsistent verdicts would be "convictions of larceny and receiving stolen goods, where the goods involved in both charges are the same. '[I]n law the guilty receiver of stolen goods cannot himself be the thief; nor can the thief be guilty of a crime of receiving stolen goods which he himself had stolen.' " *Commonwealth* v. *Diaz, supra,* quoting from *Commonwealth* v. *Haskins*, 128 Mass. 60, 61 (1880). See also *Commonwealth* v. *Carson*, 349 Mass. 430, 435-436 (1965).

The crimes involved in this matter are not mutually exclusive, and, therefore, the verdicts are not impossible as matter of law. See *Commonwealth* v. *White*, 363 Mass. 682, 683-684 (1973)(no inconsistency in a jury's finding a defendant guilty of second degree murder and not guilty of armed robbery); *Commonwealth* v. *Lowe*, 21 Mass. App. Ct. 934, 935 (1985)(no new trial required where the jury returned a verdict of guilty of breaking and entering a dwelling in the nighttime with intent to commit a felony and assault and battery, but acquitted the defendant of armed assault in a dwelling and assault and battery by means of a dangerous weapon).

The fact that the verdicts might be factually inconsistent is of no avail to the defendant. It is well settled that "factual inconsistencies in verdicts rendered in the same case do not afford a ground for setting aside a conviction." *Commonwealth* v. *Harrison*, 25 Mass. App. Ct. 267, 270 (1988), and cases cited. Further, "the rule is well established in criminal cases that mere inconsistency in verdicts, one of which is an acquittal, will not render the verdict of guilty erroneous even though such inconsistency may have indicated the possibility of compromise on the part of the jury." *Commonwealth* v. *Sherry*, 386 Mass. 682, 698 (1982), quoting from *Commonwealth* v. *Scott*, 355 Mass. 471, 475 (1969).

Finally, it is not clear that the verdicts are factually inconsistent. The jury was free to find from the evidence that the defendant was insane at the moment that he shot the victim but sane when, after the murder, he carried the guns home and, later, carried them to the woods and buried them. The jury was not required to believe, in its entirety, the testimony of the defendant's expert (a psychiatrist) that the defendant's psychotic episode continued beyond the time when he buried the guns. *Commonwealth* v. *McInerney*, 373 Mass. 136, 142 (1977). *Commonwealth* v. *Lunde*, 390 Mass. 42, 47 (1983).

3. *Contents of verdict slips.* The jury were provided with slips on which they were to record their verdicts for each charge. The verdict slips for the murder charge listed the possible verdicts: guilty of murder in the first degree, guilty of murder in the second degree, guilty of manslaughter, not guilty, and not guilty by reason of insanity. On the verdict slips for the offenses of unlawfully carrying a firearm and possessing a firearm without a firearm identification card, the possible verdicts were listed as guilty or not guilty. The omission of the option of not guilty by reason of insanity on the latter two verdict slips was called to the judge's attention by the defendant. The judge refused to correct the omissions but, instead, relied on his instructions to the jury to fill the gap.

We agree with the defendant that the better practice would have been to include the option of "not guilty by rea-

582        29 Mass. App. Ct. 571

Commonwealth *v.* Chandler.

son of insanity" on all of the verdict slips. The error does not, however, require reversal in this matter. The judge's charge to the jury clearly indicated that, despite the omission on the verdict slips, they were to decide the issue of the defendant's sanity on the firearm charges as well as the murder charge. Further, the jury was aware, through the judge's instructions, that, if they concluded the defendant was not guilty by reason of insanity with respect to either or both of the firearms violations, they were to check the boxes marked "not guilty."[3]

4. *The judge's instruction on the defendant's right not to testify.* The defendant did not testify at trial. There was no request that the judge refrain from instructing the jury on a defendant's right not to testify, *Commonwealth* v. *Buiel*, 391 Mass. 744, 746-747 (1984), and the judge, without objection from the defendant, so instructed the jury. The defendant objected to the contents of the instruction, arguing that the negative connotation associated with the judge's references to a defendant's "neglect," "refusal," "failure," and "declination" to testify constituted reversible error.

In a long line of cases, it has been held that "[n]o aspect of the charge to the jury requires more care and precise expression than that used with reference to the right of a defendant in a criminal case to remain silent and not be compelled to incriminate himself, as provided in art. 12 of the Declaration of Rights of the Massachusetts Constitution and the Fifth Amendment to the Constitution of the United States. Even an unintended suggestion that might induce the jury to draw an unfavorable inference is error." *Commonwealth* v. *Thomas*, 400 Mass. 676, 679 (1987), quoting from

---

[3]The defendant claims that the judge in his instructions to the jury shifted the burden of proof on the issue of insanity to the defendant, thereby compounding the omissions on the verdict slips. We have read the judge's entire charge. Any "slip of the tongue" was "sandwiched between repeated references to the correct standard . . . . [W]e will not engage in a 'fine-spun parsing of the . . . judge's charge to the jury [so as to turn] the appellate review of this case into [a] "quest for error" . . . .' " *Commonwealth* v. *Walker*, 370 Mass. 548, 579 n.23 (1976), quoting from *Cool* v. *United States*, 409 U.S. 100, 105 (1972).

*Commonwealth* v. *Sneed*, 376 Mass. 867, 871 (1978), citing *Commonwealth* v. *Maloney*, 113 Mass. 211, 214 (1873). The language to which the defendant objected resulted from the judge's reading of G. L. c. 233, § 20, to the jury. While the better course would have been for the judge not to repeat words such as "neglect" or "refusal," even though they appear in the statute, we conclude, reading the judge's language in its entirety, that there was no reversible error. *Commonwealth* v. *Thomas*, 400 Mass. at 680.

*Judgment affirmed.*