COMMONWEALTH *vs.* FRANK HOOKS.

No. 93-P-780.

Suffolk. January 17, 1995. - March 29, 1995.

Present: ARMSTRONG, KASS, & GILLERMAN, JJ.

*Constitutional Law*, Admissions and confessions, Waiver of constitutional rights, Assistance of counsel. *Evidence*, Admissions and confessions. *Waiver. Practice, Criminal*, Instructions to jury, Assistance of counsel. *Self-Defense.*

At a murder trial, the record of a hearing on the defendant's motion to suppress statements he made to police officers supported the judge's findings that the defendant had received Miranda warnings in full and that he had voluntarily and intelligently waived his right to remain silent: the police did not mislead the defendant by not immediately informing him of the crime he was suspected of having committed. [302-305]

At a murder trial, there was no error in the judge's instructions on self-defense. [305-307]

There was no merit to a criminal defendant's claim on appeal that trial counsel rendered ineffective assistance of counsel by failing to confront a witness with her drug treatment records, where the witness's propensity to intoxication and likelihood of intoxication on the night of the killing were amply demonstrated to the jury. [307]

INDICTMENT found and returned in the Superior Court Department on October 23, 1991.

The case was tried before *James D. McDaniel, Jr.,* J.

*Suzanne Rudalevige* for the defendant.

*Lucy A. Manning,* Assistant District Attorney, for the Commonwealth.

KASS, J. Sometime after 11 P.M., on September 27, 1991, a man, identified by at least one witness as the defendant Frank Hooks, stabbed George "Percy" Webster to death in the stairwell of 45 Hecla Street, in the Dorchester section of Boston. Hooks was charged with murder and found guilty by a jury of voluntary manslaughter. Hooks asserts three

grounds of appeal: violation by the police of his constitutional right to remain silent; flawed instructions on self-defense[1]; and ineffective assistance of counsel.[2] We affirm.

1. *Right to remain silent.* Two Boston detectives working on the Webster killing questioned Hooks at the Lynn police station after he had been arrested by the Lynn police. There are two parts to the argument that Hooks was deprived of his constitutional right to remain silent. The first is that the Miranda (see *Miranda* v. *Arizona*, 384 U.S. 436 [1966]) warnings were incomplete because they did not include a warning to the defendant that anything he said could and would be used against him[3]; the second is that Hooks did not voluntarily and knowingly waive his right because the police officers, in the early stages of their interrogation, did not tell Hooks what crime he was suspected of having committed.

If the detectives had, indeed, failed to notify the defendant that what he said in response to questioning could be used against him in court, it would require suppression of such damaging statements as the defendant might have made. *Commonwealth* v. *Coplin*, 34 Mass. App. Ct. 478, 481 (1993). Hooks's arguably damaging statements consisted of denial that he had been in Boston the previous night; denial of knowledge about where Charmaine DeBinion, a former woman friend, lived; denial that he knew Percy Webster, the victim and DeBinion's current man friend; and denial of acquaintance with any other of the characters who inhabited

[1] The court was informed at oral argument that the defendant requested counsel not to make the flawed instruction argument, but we have considered it since self-defense was a major line of defense at trial.

[2] The first two categories of argument appear in a brief filed by appellate counsel for Hooks, who is different from trial counsel. The third category, i.e., ineffective assistance of trial counsel, appears in appellate counsel's brief with a *Moffett* disclaimer (see *Commonwealth* v. *Moffett*, 383 Mass. 201 [1981]), and is elaborated in a brief filed by the defendant pro se.

[3] At the suppression hearing, defense counsel disavowed the contention that the Miranda warnings had been inadequate. That would ordinarily exclude the question from consideration on appeal, but a portion of the Miranda question is properly before us, and an important constitutional right is implicated. We, have, therefore, considered the question of the completeness of the Miranda warnings.

45 Hecla Street. DeBinion testified that Hooks had earlier come to call on her at 45 Hecla Street and that she had introduced him to Percy. Yvonne Dowdy was an eyewitness to the knifing of Percy and identified Hooks, whom she had met previously, as the killer. The aunt of Hooks in Lynn, with whom he claimed to have been staying at the time the crime occurred, did not back up his alibi when questioned by police. Under the weight of that evidence, Hooks's claim that he was not at 45 Hecla Street and knew none of the players (except DeBinion) appeared less and less credible. His arguably false and evasive statements to the police detectives who had questioned him took on the color of consciousness of guilt. That color grew stronger as Hooks, during his trial, found it expedient to urge that he had acted to defend himself from lethal assault by Webster, a theory that meshed awkwardly with saying he had not been there.

Although the tape recording of his interview by the Boston police lacked any warning to Hooks that what he said might be used against him, the Boston detectives testified that before they started the recording machine, they had given him the Miranda warnings without omission and that Hooks manifested understanding. There was similar evidence from a Lynn police officer who said he had given Hooks the full set of warnings when he, the Lynn officer, first brought Hooks to the police station an hour and a half before the taped interview by the Boston police. That warning was sufficiently close in time so that it could be thought to carry over. *Commonwealth* v. *Alicea*, 376 Mass. 506, 513-514 (1978). On that evidence, the trial judge acting on the suppression motion found that Hooks had received the Miranda warnings in full, that Hooks was aware, alert, and experienced, that he had — to a point we shall discuss below — waived voluntarily and intelligently his right to remain silent. To those findings we owe deference. *Commonwealth* v. *Mandile*, 397 Mass. 410, 412 (1986). *Commonwealth* v. *Chandler*, 29 Mass. App. Ct. 571, 576 (1990).

The focus of the motion to suppress and of the parallel position on appeal is that the detectives, by failing to tell

Hooks at the outset that they were questioning him about a homicide in Dorchester the night before, misled him into waiving his right to remain silent; his waiver, therefore, was not truly voluntary. In terms of typescript, the interrogation had covered twelve pages before the detectives touched on the killing that had occurred the night before at 45 Hecla Street and told Hooks that he was the prime suspect. After two more pages of questioning, the record reflects Hooks inquiring: "Didn't you just tell me too that I have the right to have a lawyer present?" To that Detective Dwyer responded: "Absolutely, positively," whereupon Hooks said, "Well let's get a lawyer, cause I don't understand exactly. That's the wrong word. I understand exactly what you're saying." Questioning then continued for a period that produced twenty more pages of transcript. The trial judge ordered suppressed all statements of the defendant after he requested a lawyer on the ground that after a suspect makes such a request, questioning is to cease. See *Minnick* v. *Mississippi*, 498 U.S. 146, 152 (1990); *Commonwealth* v. *Perez*, 411 Mass. 249, 258 (1991); *Commonwealth* v. *Phinney*, 416 Mass. 364, 371 (1993).

In *Colorado* v. *Spring*, 479 U.S. 564 (1987), the Court wrote it had "never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." *Id.* at 576-577, quoting from *Moran* v. *Burbine*, 475 U.S. 412, 422 (1986). Failure by law enforcement officials to state the object of the interrogation was expressly said not to be trickery. *Colorado* v. *Spring*, 479 U.S. at 577. Although Hooks invites us to adopt a more demanding standard under art. 12 of the Declaration of Rights, the Massachusetts position, even before *Colorado* v. *Spring*, has been the same. Miranda standards, the court held in *Commonwealth* v. *Medeiros*, 395 Mass. 336, 345 (1985), do not "require police to inform a suspect of the nature of the crime about which he is to be interrogated." See also *Commonwealth* v. *Marquetty*, 28 Mass. App. Ct. 690, 694-695 (1990). Ignorance of the subject of the inquiry is, however, a

factor in a court's calculus of the total circumstances of an interrogation and whether, in the light of those circumstances, the suspect's waiver was knowing, intelligent, and voluntary. *Commonwealth* v. *Medeiros*, 395 Mass. at 345. See also *Carter* v. *Garrison*, 656 F.2d 68 (4th Cir. 1981), cert. denied, 455 U.S. 952 (1982). Cf. *Commonwealth* v. *Chandler*, 29 Mass. App. Ct. at 577-579.

There was neither misleading silence nor misleading questioning in this case. After preliminaries about his rights, the first question put by Detective Dwyer was: "Frank, I want to talk to you about an incident that happened last night in Dorchester on Hecla Street. Do you know where Hecla Street is?" Although nothing had been said at that point about murder, Hooks, whose connection with the knifing at 45 Hecla Street the defense ultimately did not contest seriously, must have supposed that the police had come to question him about the stabbing of Webster. The judge correctly decided that: (1) the defendant spoke to the Boston detectives voluntarily and deliberately; and (2) questioning should have stopped when the defendant asked for a lawyer.

2. *Instructions on self-defense.* Two witnesses saw segments of the attack on Webster. One of those witnesses, Eli Young (he handled the evening shift selling cocaine from 45 Hecla Street and had turned that labor over to Webster, who worked the night shift), identified the assailant as a Marvin Hagler type; the other, Yvonne Dowdy, as noted, had met Hooks and identified him as the assailant. From their testimony the jury could have found that Hooks stabbed Webster repeatedly on the stairway and that Webster, screaming and bleeding from the chest, was running away to his apartment. Webster emerged from his apartment with a .38 caliber Smith and Wesson revolver which he attempted to fire at Hooks, but Hooks managed two more thrusts with a six-inch knife into Webster's chest. There were nine puncture wounds in Webster's chest, abdomen, left arm, and hand. The immediate cause of death was a stab wound to the upper right chest, four-and-a-half inches deep and "V"-shaped, indicating that the wound may have been inflicted with a twisting

motion. As described, the episode warranted an instruction to the jury on self-defense, and the judge delivered one. See *Commonwealth* v. *Harrington*, 379 Mass. 446, 450 (1980).

There is no quarrel by the defense about the soundness of the judge's charge on the elements of self-defense. Included in that instruction was a passage that:

> "the right of self defense ordinarily cannot be claimed by a person who provokes or initiates an assault, unless that person withdraws in good faith from the conflict and announces his intention to retire. In other words, where the Commonwealth proves beyond a reasonable doubt that a defendant initiated the confrontation or was the original aggressor, then the right of self defense is not available to him unless and until he withdraws from the confrontation in good faith and announces his retirement from the conflict.[4] This is so, because, as I have said, a defendant generally may not resort to a claim of self defense unless he first took advantage of every opportunity to avoid the conflict."

Defense counsel asked the judge to add "that it may also be that a person is not able to leave if that occurs in a split second." The judge thought that whether, in the circumstances, Hooks had been able to disengage was up to the jury, i.e., he rejected the amplification requested.

On appeal, the defense has transformed that objection to mean that it was mistaken for the judge to speak in terms of an "announcement" to withdraw. The defect in that instruction, so the argument runs, is that the jury were left to understand that the defendant had to proclaim by speech his intention to withdraw from the conflict. That is far too literal a reading of what the judge said. In context, the word "announces" reasonably would be understood to mean some sort of manifestation by the defendant to avoid further fight, for example by the simple expedient of leaving. Cf. *Commonwealth* v. *Naylor*, 407 Mass. 333, 335 (1990). Hooks had

---

[4]See *Commonwealth* v. *Maguire*, 375 Mass. 768, 772-773 (1978).

every opportunity so to do when Webster fled from him. That Hooks was still waiting on the stairs when Webster reappeared could reasonably have been understood by the jury to mean that Hooks stayed for a second round. We think the instruction did not contain the germ of confusion which the defendant by microscopic examination seeks to identify, particularly in a context of no evidence that the defendant did anything at all to remove himself from his fight with the victim.

3. *Ineffective assistance of counsel.* The defendant argues that his trial counsel's conduct fell below the standard of an ordinarily competent and also fallible lawyer (*Commonwealth* v. *Saferian*, 366 Mass. 89, 96 [1974]), by failing to confront the most damaging witness that the prosecution produced, Yvonne Dowdy, with her drug treatment records. Had trial counsel done so, Hooks argues, he would have discredited her ability to observe and remember accurately. There is nothing to this. The evidence brought out that Dowdy had been to three or four drug treatment programs on an inpatient basis, that Dowdy allowed Webster and Young to use her apartment to sell cocaine in exchange for daily payments in cash or cocaine, that she used cocaine regularly, and that on the fatal night, she had also consumed three or four beers and perhaps some rum as well. Dowdy's propensity to intoxication and the likelihood of her intoxication on the night of the killing were paraded luxuriantly before the jury. Drug treatment records would have added very little to her profile as a substance abuser. We have considered the defendant's remaining arguments regarding trial counsel's performance, and we think they are insubstantial.

*Judgment affirmed.*